# Christene L. Fancher v. Alta Benson and Jane Savoie

[580 A.2d 51]

No. 89-020

Present: Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.

Opinion Filed July 13, 1990

*Peardon Donaghy,* Montpelier, for Plaintiff-Appellee.

*Peter S. Cullen* of *Theriault & Joslin, P.C.,* Montpelier, for Defendants-Appellants.

**Morse, J.** Defendants appeal from a $25,500 jury verdict against them for violating Vermont's Consumer Fraud Act, 9 V.S.A. § 2461(b), by selling plaintiff a horse which had a weak heart. We affirm and hold that a horse is covered under the Act's definition of "goods," that the instructions on agency were proper, that the evidence supports the verdict, and that the trial court properly permitted the issue of punitive damages to go to the jury.

In October 1985, Promises to Keep ("Promise"), an eight-year-old Oldenburg mare trained for dressage,[1] underwent a twenty-two day hospitalization at the University of Georgia College of Veterinary Medicine (UGA) for a heart problem described in a UGA report of November 27, 1986, as cardio-pulmonary disease due to the presence of ventricular tachycardia. The report further stated that "[n]o structural abnormalities were identified, so it was determined the mare was not yet in congestive heart failure." It indicated that the horse was successfully treated but that a follow-up examination and "three months of pasture rest" would need to take place. It concluded:

> A few cases of ventricular tachycardia have been identified and successfully treated. . . . The animals who had no

---

[1] "Dressage" is "exhibition riding . . . in which the horse is controlled in certain difficult steps and gaits by very slight movements of the rider." Webster's New World Dictionary at 426 (2d ed. 1976).

underlying structural heart defects or evidence of congestive heart failure responded well to therapy, and returned to their normal performance levels. . . . Promise has responded well to therapy to date, so we feel her prognosis for return to performance is good.

In January 1986, defendant Alta Benson of Georgia employed defendant Jane Savoie of Richmond, Vermont, as her agent to sell Promise, and arranged for the mare to be transported from Georgia to Vermont. Both defendants signed a letter of agreement stating,

You will . . . show Promise with the aim of selling her at a time when the most profit can be realized. . . . In what I hope is the unlikely event that Promise has a recurrence of her ventricular tachycardia, we are agreed that she is to be sent to the nearest state veterinary school to be put down . . . and expenses will be shared by us. . . .

I am enclosing herewith copies of Promise's medical reports from the University of Georgia . . . .

Later in January, Barbara Hill contacted defendant Savoie looking for a horse suitable for plaintiff. Savoie told Hill that she had a horse that was not yet really "fit" due to a viral infection but that it would be ready in about a month.

On March 10, 1986, plaintiff, Hill and Hill's partner, Alix Nelson, visited the horse and were told by Savoie that Promise had been ill with the flu. She did not say that the horse had suffered from any episode of heart failure, but did say that the UGA had prepared a report. It was disputed whether the report was available for inspection then. When Nelson inquired about a shaved patch of skin on the horse that she recognized as the result of an EKG, Savoie explained that the EKG was given as a matter of course during the treatment of the respiratory problem and that there was nothing wrong with the horse's heart.

Plaintiff thereafter arranged for a prepurchase physical examination by a veterinarian, Dr. Barbara LeClair. Because there was some concern about swelling on the horse's legs, LeClair was asked to pay specific attention to that potential problem. On March 12, 1986, when LeClair arrived at the stable to perform the examination, Savoie gave her the UGA report.

Savoie testified that, "[a]s [Dr. LeClair] was reading through the symptoms that Promise had shown, her response was, 'Wow.'" LeClair testified that Savoie assured her that she had "talked to [plaintiff] about this report," and when asked, "did Jane [Savoie] say to you anything to the effect that the purchasers were not concerned about the [UGA] report?" she replied, "I can't remember specifically but I do believe—I think that was part of the conversation." LeClair conveyed her exam results to Hill by telephone, stating that "the horse appeared to be in good health and did not show any signs of the virus." Thereafter, on or about March 20, 1986, plaintiff purchased Promise. Although LeClair said she mentioned the UGA report to Hill over the telephone prior to the sale of the horse, Hill denied that Dr. LeClair disclosed any information about the condition of the horse's heart. LeCLair explained that the exam "could not disclose every underlying heart defect." On June 3, 1986, the UGA report was made available to plaintiff.

Three months after the purchase of Promise, on June 22, 1986, the mare had a recurrence of heart distress during her first competition and was put to pasture thereafter. Plaintiff brought this suit after unsuccessfully trying to return Promise to defendants for a refund of her money.

On appeal, defendants challenge the applicability of Vermont's Consumer Fraud Act to a transaction involving an animate object, and the court's failure to properly instruct the jury on the agency relationship between plaintiff and Dr. LeClair.

## I.

Defendants initially contend that the sale of a horse does not come within the covered transactions of Vermont's Consumer Fraud Act because it is not a good or service as defined by the statute. 9 V.S.A. § 2451a(b) defines goods and services as follows: "any objects, wares, goods, commodities, work, labor, intangibles, courses of instruction or training, securities, bonds, debentures, stocks, real estate, or other property or services of any kind."

The purpose of the Vermont Consumer Fraud Act is to protect the public and is remedial in nature. 9 V.S.A. § 2451;

*State v. Custom Pools*, 150 Vt. 533, 536, 556 A.2d 72, 74 (1988). We will not give the definition of "goods"—i.e., "property . . . of any kind"—such a narrow construction as to exclude living property, which, just as inanimate objects, is bought and sold. See, e.g., *Scholtz v. Sigel*, 601 S.W.2d 516, 519 (Tex. Civ. App. 1980) (animals are "goods" and, just as inanimate objects, may be the subject of a deceptive trade practice); see generally *Travis v. Washington Horse Breeders Ass'n*, 111 Wash. 2d 396, 759 P.2d 418 (1988) (en banc) (sale of horse with a defective heart violated consumer protection laws).

## II.

The principal issue raised by defendants is that the court failed to instruct the jury that Dr. LeClair was plaintiff's agent for purposes of determining the state of Promise's health, and further, that anything disclosed to LeClair on that subject was functionally the same as disclosure to plaintiff herself. Plaintiff contended at trial that she had been deceived by Savoie into believing that Promise had suffered only the flu. There was no dispute, however, that LeClair had read the UGA report about one week prior to the purchase of Promise by plaintiff.

We agree that such an instruction was proper under the undisputed facts presented at trial. No other conclusion but that Dr. LeClair served as plaintiff's agent in determining Promise's health condition can be reached. *Estate of Sawyer v. Crowell*, 151 Vt. 287, 291, 559 A.2d 687, 690 (1989); *Solomon v. Design Development, Inc.*, 143 Vt. 128, 131, 465 A.2d 234, 236 (1983).

The trial court instructed the jury as follows:

> Just as the seller is responsible for what the seller's agent said or did, the buyer is deemed to have the same knowledge which the seller or her agent passed on to the buyer's agent. Also the buyer cannot claim she did not have notice of a particular fact if her agent did have notice of the fact. For you to find that any witness was acting as agent for either seller or the buyer, you must find that the seller or

the buyer gave the witness authority to do an act on behalf of the seller or buyer.

Defendants did not object to this instruction. Although defendants submitted a written request to charge, including a request for an instruction directing the jury to find that LeClair was plaintiff's agent, defense counsel waived that request when he stated at a charge conference, "I think it's up to the jury to decide whether Dr. LeClair is an agent or not." In effect, the court gave the jury an instruction as requested by defendants and committed no error.

## III.

Defendants further contend that a directed verdict should have been granted in their favor because LeClair, as plaintiff's agent, received the UGA report prior to the sale of Promise and plaintiff was bound by that disclosure. We disagree.

The jury could have found that Savoie deceived LeClair by telling her in effect that plaintiff knew about the contents of the UGA report and was not concerned about it, thereby prompting LeClair to keep silent about the report unless asked by plaintiff or someone else on plaintiff's behalf. This was a jury question and not proper for resolution as a matter of law by the court.

Defendants also argue that they were entitled to a directed verdict because plaintiff did not try to return the horse once she learned of the contents of the UGA report on June 3, some three weeks before the second heart distress episode. This ground for a directed verdict was waived because it was not raised at trial. Even if it were, this evidence would reflect on the reasonableness of plaintiff's reliance in purchasing Promise based on the lack of information about the horse's heart, which again would be a jury question.[2]

---

[2] Because not raised before the trial court, we decline to reach defendants' claim that a judgment notwithstanding the verdict (jnov) or a new trial should have been granted because of inconsistent verdicts. Although instructed on the law of breach of express warranty and the implied warran-

## IV.

Finally, defendants claim that the court erred when it submitted the issue of punitive damages to the jury. "The statute requires an award of exemplary damages only where malice, ill will, or wanton conduct is demonstrated." *Bruntaeger v. Zeller*, 147 Vt. 247, 252, 515 A.2d 123, 127 (1986). The jury could have reasonably inferred that defendant Savoie intentionally delayed disclosure of the UGA report to plaintiff, lied about what the report contained, and deceived LeClair into not promptly informing plaintiff of the contents of the report. There was sufficient evidence of malice—e.g., the use of "sharp" selling tactics—to instruct the jury on punitive damages.

*Affirmed.*

ties of merchantability and fitness for a particular purpose, the jury returned verdicts in defendants' favor on these theories of liability.