## Diana Carter v. Flavia Gugliuzzi, et al. and Synergy Group, Inc.

[716 A.2d 17]

No. 97-094

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed May 22, 1998

*James A. Dumont* of *Keiner & Dumont, P.C.*, Middlebury, for Plaintiff-Appellant.

*John D. Monahan, Jr., Shapleigh Smith, Jr.*, and *Craig S. Nolan* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Defendant-Appellee.

**Johnson, J.** Defendant Synergy Group, Inc., doing business as Smith Bell Real Estate, appeals from a superior court judgment in favor of plaintiff Diana Carter. Carter's suit alleged that Smith Bell, through its agents, had made a number of misrepresentations and omissions in connection with her purchase of a house. Smith Bell contends the court erred in ruling: (1) that the Vermont Consumer Fraud Act, 9 V.S.A. §§ 2451-2480g, applied to deceptive acts or practices of real estate brokers with respect to home buyers; and (2) that the knowledge of its agent concerning wind conditions on the property could be imputed to Smith Bell. Carter also appeals, contending that the court erred in determining damages. We affirm the judgment imposing liability on Smith Bell, and reverse and remand on the issue of damages.

The material facts are largely undisputed: In 1990, Flavia Gugliuzzi and Ana Barreto (sellers) asked Ruth Bennett, a licensed real estate salesperson, to list their house for sale. Sellers had owned the house since 1987, and had originally purchased it through Bennett, who worked for Smith Bell. Bennett worked under the supervision of David Crane, a licensed real estate broker and an officer, director, and shareholder of the company. In response to sellers' call, Bennett went to the house, located in the Pleasant Valley area of Underhill, to fill out a sales authorization, Multiple Listing Service (MLS) sheet, and a fact sheet highlighting special features of the house. Sellers told Bennett that they had installed new hardwood floors in the downstairs and had replaced some windows, and that the window boxes would stay with the house. They pointed out the boundaries of the property. Bennett measured the interior dimensions of the rooms and the exterior dimensions of the house. She prepared an MLS listing sheet and a fact sheet and showed them to sellers, who confirmed that

they were accurate. The listing sheet stated that the house contained 1880 square feet above grade, was heated by electric/wood, and was "in pristine condition. New pegged floors throughout first floor." The Smith Bell fact sheet, under the heading "Further Features," stated: "New oak-pegged floors throughout first floor," "[w]indow quilts at all windows with new valances," and "[c]ustom made flower boxes at all windows." Under the heading "Location," the fact sheet stated, "400 to 600 planted pine trees around borders of property" and "[v]acant beaver pond."

The sheets, in fact, contained a number of errors and omissions. The downstairs hardwood floor did not run "throughout" the house but covered only about half the downstairs and was a simulated rather than a real pegged floor; the rest of the floor was carpeted. The wood floor was not in "pristine" condition, but had buckled or "cupped" due to the lack of an underlying vapor barrier. The listing sheet did not indicate that the den and upstairs bathroom were unheated. The fact sheet stated that "all" windows had quilts and valances, although only about half had these features. In addition, the fact sheet failed to disclose that half of the advertised "beaver pond" was on a neighbor's property, and misstated the number of trees as 400 to 600 when, in fact, there were only about 250.

The court further found that Crane knew, but did not disclose to Bennett or Carter, that the house was subject to frequent and severe winds, that one of the windows in the house had blown in years earlier, and that other houses in the area had suffered wind damage. Crane had lived in the Pleasant Valley area for seven years, had sold a number of nearby properties, and had been Underhill's zoning administrator. He was aware that Pleasant Valley occasionally experienced winds of over 80 miles-per-hour and often had winds in the 40 to 50 mile-per-hour range, and that many Valley residents, including Crane, had wind gauges on their homes to measure and compare wind speeds with their neighbors.

Diana Carter, a lawyer living in California, had been looking for a house to buy in Vermont since mid-1990. She contacted several realtors, including Liz Merrill, an agent from Lang Associates, who provided her with information on a number of houses, including the listing and fact sheets relating to the Underhill property. Carter was attracted by the size of the house, the acreage, and the fact that it was listed as being in "pristine" condition. Merrill, acting as a sub-agent for the seller, showed Carter the house twice. Carter did not note the lack of heat in the upstairs rooms, the condition or extent of the wood

floor downstairs, or the number of trees on the property. She later asked Merrill to provide additional information about the neighborhood and the condition of the house. Bennett informed Merrill that a storm had washed out the beaver pond since Carter's last visit, but that it could be reestablished with minimal cost and effort. Apart from the pond, Bennett assured Carter and Merrill that there had been full disclosure.

Carter's offer of $200,000 for the house was accepted in August 1990. After moving in, Carter discovered that the den and bathroom were unheated, the downstairs wood floor was in poor condition and covered only a portion of the floor, several hundred trees, the window flower boxes, and cabinets in the garage were missing, half of the beaver pond was on a neighbor's property, and expensive engineering studies and permits would be required to reestablish the pond. Several months later, a series of high winds toppled several trees on the property, blew in a number of windows, tore shingles off the house and garage, and blew gutters off the house.

Carter sued sellers and Smith Bell for fraud, negligent misrepresentation, and breach of contract, and Smith Bell for violation of the Consumer Fraud Act. Following a court trial, the court ruled, inter alia, that Crane's knowledge of the presence of high winds was imputable to Smith Bell, and that the company, through its agents, was liable in tort for a number of misrepresentations and omissions, and for violations of the Act. The court found both Smith Bell and sellers liable for the wind damage, future replacement of windows, the cost of additional trees to create a wind break, additional window quilts, and replacement of the downstairs carpet with an oak pegged floor. The total judgment was for $30,624 plus interest and costs. The court found sellers additionally liable for the missing window flower boxes, replacement of the cupped floors, and reestablishment of the pond for an additional judgment of $19,700. The court declined to impose liability on Smith Bell for misrepresenting the total above-grade square footage of the house and the number of trees on the property, failing to disclose that a portion of the house was unheated, repairing the cupped flooring, reestablishing the pond, replacing the missing flower boxes and garage cabinets, and certain prospective wind repairs.

## I.

Smith Bell first contends the court erred in ruling that the Consumer Fraud Act applied to the deceptive acts of real estate

brokers against home buyers. The express statutory purpose of the Act is to "protect the public" against "unfair or deceptive acts or practices." 9 V.S.A. § 2451. Its purpose is remedial, and as such we apply the Act liberally to accomplish its purposes. See *State v. Therrien*, 161 Vt. 26, 31, 633 A.2d 272, 275 (1993); *Fancher v. Benson*, 154 Vt. 583, 586, 580 A.2d 51, 53 (1990). In construing the Act, we look to the interpretations accorded similar terms and provisions of the Federal Trade Commission Act and other state consumer protection laws. See 9 V.S.A. § 2453(b); *Bisson v. Ward*, 160 Vt. 343, 350, 628 A.2d 1256, 1261 (1993); *Fancher*, 154 Vt. at 587, 580 A.2d at 53; *Poulin v. Ford Motor Co.*, 147 Vt. 120, 124, 513 A.2d 1168, 1171 (1986).

The Act provides a remedy for any consumer who contracts for goods or services and, in reliance upon false or fraudulent representations or promises, sustains damages or injury at the hands of "the seller, solicitor or other violator." 9 V.S.A. § 2461(b). Smith Bell contends that it fits within none of these categories; it did not, it asserts, "sell" property to Carter, but merely assisted the homeowners in the sale, nor did it directly and actively "solicit" Carter to purchase the property. Furthermore, Smith Bell notes that the Act prohibits only deceptive acts or practices "in commerce," *id.* § 2453(a), and asserts that the sale of a home between nonmerchants is "strictly private in nature" (citing *Lantner v. Carson*, 373 N.E.2d 973, 977 (Mass. 1978)) and does not occur "in commerce."

We have not previously considered whether a real estate broker constitutes a "seller, solicitor or other violator" within the meaning of the Act. The Act defines a "seller" as one who is "regularly and principally engaged in a business of selling goods or services to consumers." 9 V.S.A. § 2451a(c). The Act does not, however, state what it means to "sell" goods or services, nor does it define "solicitor or other violator." We are not, however, lacking for guidance as to the Act's meaning and intent. We note, initially, that the Act expressly includes "real estate" within the meaning of goods and services, *id.* § 2451a(b), and applies the prohibition against deceptive acts and practices specifically to "real estate transactions." *Id.* § 2453(e). Furthermore, although Smith Bell argues that only the title-holder can "sell" real estate, nothing in the Act compels such a narrow construction. We have consistently held that words in a statute which have not been specifically defined should be accorded their plain and commonly accepted meaning. See *State v. Yorkey*, 163 Vt. 355, 359, 657 A.2d 1079, 1081 (1995); *State v. Camolli*, 156 Vt. 208, 213, 591 A.2d 53, 56 (1991). The ordinary meaning of "sell" includes "to cause or

further the sale of," "[t]o deal in an article of sale; as, to *sell* groceries or insurance." Webster's New International Dictionary 2272 (2d ed. 1953). Indeed, Smith Bell's exclusive listing agreement with Carter used the term in precisely this fashion, granting Smith Bell authority for the marketing and "sale" of the property.

Guidance is also available from related provisions of the Act. We note, for example, that it expressly exempts publications and radio and television stations in which an "offer to sell appears." 9 V.S.A. § 2452. Where remedial legislation contains an express limitation, we have generally declined to expand the exception beyond its plain terms. See *Grenafege v. Department of Employment Sec.*, 134 Vt. 288, 290, 357 A.2d 118, 120 (1976). Obviously, if the Act applied only to sellers who held title or were otherwise in privity with buyers, such an exception would be superfluous. Moreover, to expand this limited "media" exception to include real estate brokers would plainly undermine the Act's remedial purpose, and contravene our stated policy to construe the statute liberally.

Apart from the terms of the Act itself, guidance is also available in the case law. Although the issue was not directly raised, we note that this Court in *Fancher* upheld the liability under the Act of an *agent* who made misrepresentations about the condition of a horse on behalf of its owner. 154 Vt. at 585-88, 580 A.2d at 52-54. We note, as well, the decisions of the Federal Trade Commission and numerous state courts that apply the Federal Trade Commission Act and similar state consumer protection laws to real estate brokers who commit deceptive acts or practices in the sale of real estate. See, e.g., *In re Meredith Corp.*, 101 F.T.C. 390, 390 (1983); *Young v. Joyce*, 351 A.2d 857, 859 (Del. 1975); *Cieri v. Leticia Query Realty, Inc.*, 905 P.2d 29, 39-40 (Haw. 1995); *Riley v. Fair & Co., Realtors*, 502 N.E.2d 45, 48 (Ill. App. Ct. 1986); *Nei v. Burley*, 446 N.E.2d 674, 680 (Mass. 1983); *Attorney Gen. v. Diamond Mortgage Co.*, 327 N.W.2d 805, 811 (Mich. 1982); *Durbin v. Ross*, 916 P.2d 758, 766 (Mont. 1996); *Forbes v. Par Ten Group, Inc.*, 394 S.E.2d 643, 650-51 (N.C. Ct. App. 1990); *Strawn v. Canuso*, 657 A.2d 420, 429 (N.J. 1995); *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540-41 (Tex. 1981); *McRae v. Bolstad*, 676 P.2d 496, 500 (Wash. 1984).

Considered in the light of these decisions, the remedial purposes of the Act, and its plain and ordinary meaning, the trial court's conclusion that "seller" includes real estate brokers engaged in residential real estate transactions was eminently sound.

■ Smith Bell's corollary claim that the transaction did not occur "in commerce" is equally without merit. Although "commerce" is not defined in the Act, its ordinary meaning as an "interchange of goods and commodities, [especially] on a large scale," Random House Unabridged Dictionary 1739 (2d ed. 1987), obviously applies to Smith Bell, a company engaged, as the court found, in the sale of real estate throughout Chittenden County. Decisions in other jurisdictions are uniformly in accord. See, e.g., *Cieri*, 905 P.2d at 40 ("[T]he broker's or salesperson's role in facilitating . . . real estate transaction[s] in which he or she participates necessarily involves 'conduct in any trade or commerce.'"); *McRae*, 676 P.2d at 499 (realtor acted "within the sphere of trade or commerce" under consumer protection act). The Massachusetts decision on which Smith Bell relies, *Lantner*, involved a suit against a private vendor, not a realtor engaged in the business of selling homes. 373 N.E.2d at 977. Indeed, in *Nei*, the Massachusetts Supreme Judicial Court subsequently applied the state consumer protection act to real estate brokers. 446 N.E.2d at 679. In the other decision cited by Smith Bell, *Wilder v. Aetna Life & Casualty Ins. Co.*, we held only that the sale of an insurance policy was not a contract for "goods or services" under the Act. 140 Vt. 16, 18, 433 A.2d 309, 310 (1981). Hence, the trial court correctly concluded that Smith Bell was a "seller" involved "in commerce" within the meaning of the Act.

## II.

Smith Bell additionally contends the court erred in ruling that Crane's knowledge about the presence of high winds on the property could be imputed to the company. Crane, to recall, had supervised and consulted with the listing agent, Ms. Bennett, inspected the property, and conveyed certain information concerning the house to Carter. Hence, the trial court's threshold finding that Crane had operated as an agent of Smith Bell was thus amply supported by the evidence. See *Roy v. Mugford*, 161 Vt. 501, 512, 642 A.2d 688, 694 (1994) (findings not clearly erroneous if supported by reasonable and credible evidence).

A fundamental tenet of agency law holds that "the knowledge of an agent acting within the scope of his or her authority is chargeable to the principal, regardless of whether that knowledge is actually communicated." *Estate of Sawyer v. Crowell*, 151 Vt. 287, 291, 559 A.2d 687, 690 (1989). Smith Bell argues that Crane's knowledge about the high winds should not have been imputed to the company because

it was obtained *outside* the scope of his employment. Carter, in response, asserts that the general rule has been abrogated by decisions suggesting that information obtained outside the scope of employment may nevertheless be imputed to the principal, at least where it appears that the information "is actually in [the agent's] mind at the time he performs the act in question." *Simpson v. Central Vt. Ry.*, 95 Vt. 388, 395, 115 A. 299, 302 (1921).

The debate in this case is academic. For contrary to Smith Bell's claim, the trial court did *not* find that Crane's knowledge was obtained outside the scope of his employment. As noted earlier, the court found that Crane "had lived in the area, had listed and sold many nearby properties, and had been Underhill's zoning administrator. Mr. Crane was aware that Pleasant Valley . . . had winds of over 80 m.p.h." The court further noted that real estate licensees had a statutory duty to "fully disclose to a buyer all material facts within the licensee's knowledge concerning the property being sold." 26 V.S.A. § 2296(a)(10). Since the statute governing a real estate agent's duty to disclose made "no distinction as to the source of the knowledge," the court concluded that such knowledge was similarly imputable to the agent's principal regardless of the source.

The court's reasoning was sound. It is immaterial whether Crane's information was derived from his residence in the area, his listing and sale of other properties in the area, or his experience as the town's zoning officer. A broker's statutory duty is to fully disclose *all* material facts within his or her knowledge. See *id.*; see also Rules of the Real Estate Commission, Rule 31(b) (1987) ("A licensee who is a seller's agent must fully disclose to a prospective buyer all material facts within his or her knowledge concerning the property being sold."). The rule reflects the reality that a broker's business consists precisely of acquiring and conveying information about the community, neighborhood conditions, comparable properties, and other local factors that may affect the value, marketing and sale of property. See *Strawn*, 657 A.2d at 431-32 ("Location is the universal benchmark of the value and desirability of property."). Such information is always, in effect, acquired in the "scope of employment." It is thus meaningless to attempt to parse a broker's knowledge about a given property on the basis of the precise time, date, or circumstances in which it was obtained. Crane's knowledge concerning the presence of high winds on the property was properly imputed to Smith Bell.

## III.

Carter contends on appeal that the trial court misapplied the Consumer Fraud Act and, as a result, erred in determining damages. As noted, the Consumer Fraud Act prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). To establish a "deceptive act or practice" under the Act requires three elements: (1) there must be a representation, omission, or practice likely to mislead consumers; (2) the consumer must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be material, that is, likely to affect the consumer's conduct or decision regarding the product. See *Peabody v. P.J.'s Auto Village, Inc.*, 153 Vt. 55, 57, 569 A.2d 460, 462 (1989). Deception is measured by an objective standard, looking to whether the representation or omission had the "capacity or tendency to deceive" a reasonable consumer; actual injury need not be shown. *Bisson*, 160 Vt. at 351, 628 A.2d at 1261; *Peabody*, 153 Vt. at 57, 569 A.2d at 462. To be reasonable, moreover, the consumer's understanding need not be the *only* one possible; "[i]f an ad conveys more than one meaning to reasonable consumers and one of those meanings is false, that ad may be condemned." *In re Bristol-Myers Co.*, 102 F.T.C. 21, 320 (1983). Furthermore, the Act "does not require a showing of intent to mislead, but only an intent to publish the statement challenged." *Winton v. Johnson & Dix Fuel Corp.*, 147 Vt. 236, 244, 515 A.2d 371, 376 (1986).

Materiality is also generally measured by an objective standard, premised on what a reasonable person would regard as important in making a decision; it may include a subjective test, however, where the seller knows that the consumer, because of some peculiarity, is particularly susceptible to an omission or misrepresentation. See *In re Cliffdale Assocs.*, 103 F.T.C. 110, 179 (1984); Restatement (Second) of Torts § 538(2)(b) (1977). The federal courts and Trade Commission apply a general presumption of materiality. "Where the seller knew, or should have known, that an ordinary consumer would need omitted information to evaluate the product or service, or that the claim was false, materiality will be presumed because the manufacturer intended the information or omission to have an effect." *Cliffdale*, 103 F.T.C. at 182; see also *Kraft, Inc. v. Federal Trade Comm'n*, 970 F.2d 311, 322 (7th Cir. 1992) (presumption of materiality applies to broad category of claims).

Carter contends the court misapplied the Act in determining damages in several areas. First, she claims that the listing sheet's

representation that the house contained 1880 square feet above grade was deceptive because a den and bathroom were unheated. The parties generally agreed that square footage represents the amount of finished living space. The court found that the unheated rooms were "liveable," if "chilly," and that the 1880 measurement was accurate. The record evidence supported these findings, and the findings supported the conclusion that the 1880 figure was not false or deceptive.

In a related claim, Carter contends that the listing sheet's representation that the house was heated by electricity and a wood stove, omitting any mention that certain portions were unheated, was deceptive. The court concluded that the omission was not "material" because "[u]nheated rooms are common in Vermont where one source of heat for the home is a wood burning stove." It is unclear, however, whether the court was actually finding that the omission was not deceptive because it was unlikely to mislead a reasonable consumer, or that even if misleading it was not material because it would not have affected the decision of a reasonable home buyer in Vermont. It *is* clear that the court did not expressly consider the fact, known to Smith Bell's agents, that Carter was moving from California and may not have been as familiar with Vermont housing conditions as the typical in-state purchaser. A statement or omission may convey more than one reasonable meaning, and if one of those meanings is deceptive, it violates the Act. See *Bristol-Myers*, 102 F.T.C. at 320. Furthermore, an omission may be material to a particular consumer based upon a subjective factor known to the seller. See *Cliffdale*, 103 F.T.C. at 182. The court simply did not address these pertinent issues of fact and law. Therefore, the damage award must be reversed, and the case remanded to the trial court to make additional findings and conclusions.

Carter also claimed that Smith Bell was liable for failing to disclose that cabinets in the garage that appeared to be fixtures were not, and that sellers planned to take them. The court found that the cabinets were not fixtures, that sellers were entitled to take them, and that in any event the nondisclosure was not material. In light of the undisputed evidence that replacement of the cabinets would cost $2,000, we cannot agree that the omission was immaterial; it plainly could have affected the parties' negotiations or the purchase price. The court made no finding, however, on the threshold question whether the omission was deceptive, that is, whether a reasonable consumer would have found the nondisclosure concerning the cabi-

nets to be misleading. Hence, the court must address this issue on remand.

Carter further claimed that Smith Bell was liable for misrepresenting the number of trees on the property. The court found, in effect, that the representation, although inaccurate, was not deceptive because it was not reasonable for Carter to rely on the figure as representing the precise number of trees, and that the 400 to 600 figure was a reasonable estimate. The United States Supreme Court has observed that determining whether a claim is deceptive under the Federal Trade Commission Act involves the exercise of common sense and "pragmatic judgment." *Federal Trade Comm'n v. Colgate-Palmolive Co.*, 380 U.S. 374, 385 (1965). We cannot say that the court, having heard all of the evidence and testimony concerning the nature and extent of the property, erred in concluding that the representation was not deceptive under the circumstances.

Carter next contends the court erred in concluding that Smith Bell could not be held liable for misrepresenting the condition of the oak floor. The court reasoned that Smith Bell lacked the engineering expertise to be aware of the floor's damaged condition. As noted, however, lack of intent to deceive or good faith are not defenses under the Consumer Fraud Act. See *Winton*, 147 Vt. at 243-44, 515 A.2d at 376 (liability for misrepresentation under Act requires "only an intent to publish the statement challenged"); *Federal Trade Comm'n v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) (neither good faith nor lack of intent to deceive immunizes seller from responsibility for misrepresentations under Federal Trade Commission Act). Smith Bell's reliance on our decision in *Provost v. Miller*, 144 Vt. 67, 473 A.2d 1162 (1984), is misplaced, as that case involved a negligent misrepresentation claim, not a claim under the Consumer Fraud Act. Therefore, Smith Bell's liability for repair of the oak floor must be reconsidered on remand.

■ The trial court also ruled that Smith Bell was not aware of, and therefore not liable for, misrepresentions concerning the location of the beaver pond, the expenses required to reestablish the pond, and the fact that the window flower boxes would remain with the house. The absence of intent based upon a lack of knowledge or expertise is not a defense to a claim under the Act. See *Winton*, 147 Vt. at 243-44, 515 A.2d at 376. Accordingly, these claims must be reconsidered on remand, as well.

■ Carter claims that the court erroneously calculated the wind damage award. The court awarded Carter $9,800 for the costs

incurred in gluing down roof shingles, replacing some windows, and replanting trees to create a windbreak. The court awarded an additional $5,000 to install wind resistant windows, and $5,000 to enhance the windbreak. Carter contends the court erred in failing to award damages for certain additional repairs recommended by her architectural expert, including approximately $17,000 for a special wind-resistant metal roof, and an additional $17,000 for additional wind screening. It rests within the trial court's broad discretion to determine the best measure of damages to compensate the injured party. See *Jensvold v. Town & Country Motors, Inc.*, 162 Vt. 580, 586, 649 A.2d 1037, 1041 (1994). We will not disturb an award unless it is clearly excessive or insufficient. See *Grey v. Konrad*, 133 Vt. 195, 196, 332 A.2d 797, 798-99 (1975). Here, the expert witness acknowledged that a metal roof was not the only viable approach to combating high winds, and that roofing manufacturers also recommended using either roof cement or a high-wind nailing pattern. The evidence concerning the number and extent of trees necessary for a windbreak also varied. Thus, we cannot conclude that the damage award for wind repairs was clearly insufficient.

Finally, Carter contends the court applied an erroneous legal standard in declining to award punitive damages. The court expressly found that Smith Bell had not acted with malice, ill will, or wanton disregard of Carter's rights. This was the proper test. See *Bisson*, 160 Vt. at 351-52, 628 A.2d at 1262. Carter complains that the court went on to find that Smith Bell's acts did not "evince a pattern of oppressive behavior." We are not persuaded, however, that the court applied a substantively different or more stringent standard by its subsequent use of this alternative phrasing.

*That portion of the court's decision awarding damages is reversed, and the case is remanded to the Chittenden Superior Court for reconsideration of the issue of damages consistent with the views expressed herein. In all other respects the judgment is affirmed.*