2008 VT 6

## Normand E. Inkel and Brandy Inkel v. Pride Chevrolet-Pontiac, Inc., The Pride Motor Group, Michael Iovanna and Mark Korbac

[945 A.2d 855]

No. 06-220

Present: Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Cook, D.J. (Ret.), Specially Assigned

Opinion Filed January 18, 2008

*Michael Marks* and *Daniel Richardson* of *Tarrant, Marks & Gillies*, Montpelier, for Plaintiffs-Appellants.

*John Paul Faignant* of *Miller Faignant & Behrens, P.C.*, Rutland, for Defendants-Appellees.

¶ 1. **Burgess, J.** Plaintiffs Normand and Brandy Inkel appeal the superior court's order granting defendant Pride Chevrolet[1] summary judgment and awarding the car dealership damages

---

[1] As the caption indicates, there are multiple defendants in this case. For the sake of simplicity, we will refer to all defendants as Pride Chevrolet.

after rejecting the Inkels' consumer-fraud claims concerning their purchase of a truck from the dealership. In addition to challenging the grant of summary judgment to Pride Chevrolet, the Inkels contend that they are entitled to summary judgment based on undisputed facts demonstrating that the dealership effectively raised the price of the truck by initially telling the Inkels that they would not have to pay for excess mileage on their leased trade-in but later informing them that, because of the excess mileage, they owed significantly more money on the trade-in than the amount indicated in the vehicle-purchase contract. Upon review of the record, we conclude that summary judgment is not appropriate for either party based on the evidence submitted thus far because neither the Inkels nor Pride Chevrolet have demonstrated that they are entitled to judgment as a matter of law on the issue of whether the dealership engaged in unfair or deceptive acts or practices pertaining to the sale of the subject vehicle. Accordingly, we reverse the superior court's decisions granting Pride Chevrolet summary judgment and awarding the dealership damages, and we remand the matter for trial.

¶ 2. The following facts, for the most part, are elicited from the Inkels' depositions, which represent nearly all of the evidence submitted in support of the parties' opposing motions for summary judgment. See *White v. Quechee Lakes Landowners' Ass'n*, 170 Vt. 25, 28, 742 A.2d 734, 736 (1999) ("In determining whether a dispute over material facts exists, we accept as true allegations made in opposition to the motion for summary judgment, so long as they are supported by affidavits or other evidentiary material."). In early 2004, the Inkels, a logger and his wife from Albany, Vermont, contacted Pride Chevrolet, a Boston-area car dealership, to express their interest in purchasing a 2004 Chevy Tahoe truck. Brandy Inkel spoke by telephone with a Pride Chevrolet sales representative. According to her deposition testimony, Mrs. Inkel told the sales representative that she and her husband were currently leasing a 2000 GMC Yukon truck with very high mileage financed through the Chittenden Bank. After obtaining some information from Mrs. Inkel and contacting the Chittenden Bank, the sales representative called Mrs. Inkel back and told her that the payoff amount for the Yukon truck was $14,720. According to Mrs. Inkel, the sales representative also told her that the high mileage on the vehicle would not be a problem because the lease was through a private bank rather than General

Motors Acceptance Corporation (GMAC), and that although GMAC would have insisted on an over-mileage payment, the Chittenden Bank wanted only the payoff amount and did not care about the additional miles.

¶ 3. On February 14, 2004, Normand Inkel drove to Pride Chevrolet in Lynn, Massachusetts to finalize the purchase of the Tahoe truck. The sales representative presented Mr. Inkel with a copy of the purchase agreement, which included the following calculations that had been typed onto the front of the preprinted agreement: total price: $41,200; trade-in allowance: $7500; rebate: $3000; trade difference: $30,700; documentary preparation: $199.97; total contract price: $30,899.97; balance due on trade-in: $14,720; subtotal: $45,619.97; deposit: $500; amount to be financed: $40,674.97; cash due on delivery: $4500; total payment: $45,674.97.

¶ 4. On the front side in small preprinted type, the agreement also stated that the contract was not binding on either the dealer or the purchaser unless the purchaser provided the dealer with a valid title for the trade-in. The back page of the agreement listed in preprinted type "ADDITIONAL PROVISIONS" set forth in several paragraphs. The following sentence was included near the bottom of the back side of the agreement in the middle of one of those paragraphs:

> In the event the amount quoted by me or the holder of any lien covering the trade-in is not correct and the amount necessary to satisfy any such lien exceeds the amount taken into account in the obverse side of this Motor Vehicle Purchase Contract, I agree to pay such deficiency immediately upon demand thereof.

¶ 5. Mr. Inkel signed the agreement that day, left the GMC truck for trade-in with the dealership, and drove the new Tahoe truck home. Approximately one month after the sale, an employee of Pride Chevrolet called the Inkels and told them that they owed an additional $1715 because the Chittenden Bank had misinformed the dealership as to the correct payoff amount. The Inkels objected to paying the additional money, but indicated that they might be willing to split the difference. Several days later, the employee called back and said that the situation was much worse than originally thought — the Inkels owed Pride Chevrolet an additional $16,435 — explaining that the additional amount was needed to buyout the lease agreement on the trade-in because of

significant over-mileage charges. The Inkels refused to pay. Over the next few days, the employee called back several times, warning the Inkels of various consequences if they did not pay the additional amount. At some point, the employee also offered to "wash the deal," meaning that plaintiffs would return the new truck and the dealership would return the trade-in.

¶ 6. In early April 2004, one of the owners of Pride Chevrolet called the Inkels and asked them to file suit against the Chittenden Bank. The Inkels declined to do so, telling the owner to contact their attorney. In August, the owner sent the Inkels a copy of a "Notice of Complaint Hearing," a form of process advising them to appear at a proceeding in Massachusetts to face allegations of larceny and larceny by false pretenses in connection with the dispute. The Inkels appeared before a Massachusetts district court, which dismissed the charges. Following the dismissal of those charges, the Inkels filed the underlying complaint against Pride Chevrolet and individuals associated with the dealership, alleging consumer fraud, abuse of process, malicious prosecution, and breach of contract. The Inkels also named the Chittenden Bank as a party because its interests might be affected by the suit, but made no claim of damages against the bank.

¶ 7. After the parties filed opposing motions for summary judgment, the superior court issued a decision rejecting the Inkels' claims and granting summary judgment to defendants. In arriving at this decision, the court concluded, among other things, that (1) the vehicle-purchase agreement unambiguously and reasonably required the Inkels to pay off any lien to allow the dealership to obtain title to the trade-in, including any additional funds necessary because of an inaccurate buyout amount provided by the purchaser or the lien holder; (2) the contract buyout amount was inaccurate because of a mutual mistake about the actual amount needed to satisfy the lien on the trade-in; (3) the Inkels knew or should have known that the buyout amount was incorrect; and (4) Pride Chevrolet's employees did not make false or misleading representations to the Inkels, attempt to coerce additional sums from the Inkels, or raise the price of the vehicle that the Inkels purchased. Following a later hearing on damages, the court issued a decision and judgment order awarding Pride Chevrolet $19,706. On appeal, the Inkels argue that the superior court erred by (1) granting summary judgment to defendants

based on undisputed facts that do not support the judgment; (2) not awarding summary judgment to the Inkels based on their consumer-fraud claims; (3) misapplying principles of contract law; and (4) entering judgment against both Normand and Brandy Inkel even though Normand Inkel was the only person who signed the vehicle-purchase agreement and who held title to the new truck.

¶ 8. We review motions for summary judgment de novo on appeal, applying the same standard of review as the trial court. *Anderson v. Cooperative Ins. Cos.*, 2006 VT 1, ¶ 6, 179 Vt. 288, 895 A.2d 155. The moving party can prevail on a motion for summary judgment only by demonstrating that there is no genuine issue as to any material fact and that that party is entitled to judgment as a matter of law. *Id.* Thus, if a genuine issue of material fact exists or the moving party is not entitled to judgment as a matter of law, summary judgment is not appropriate.

¶ 9. We start with the consumer-fraud claims, wherein the Inkels allege that Pride Chevrolet engaged in unfair or deceptive practices by demanding additional money beyond that agreed to in the parties' contract and by engaging in harassing conduct following the sale of the vehicle to coerce the Inkels into giving them more money. These claims against Pride Chevrolet derive from Vermont's Consumer Fraud Act, which prohibits unfair or deceptive acts or practices in commerce. 9 V.S.A. § 2453(a). To prevail on a claim under the Act, a complainant must prove that: "(1) the representation or omission at issue was likely to mislead consumers; (2) the consumer's interpretation of the representation was reasonable under the circumstances; and (3) the misleading representation was material in that it affected the consumer's purchasing decision." *Jordan v. Nissan N. Am., Inc.*, 2004 VT 27, ¶ 5, 176 Vt. 465, 853 A.2d 40.

¶ 10. The elements are viewed under an objective standard because the focus of the Act is to protect the public rather than punish wrongdoing. See 9 V.S.A. § 2451 (stating that the purpose of the Act is to complement comparable federal law designed to protect the public). "Under the Act's objective standard, a consumer establishes the first element if she proves that the representation or omission had the tendency or capacity to deceive a reasonable consumer." *Jordan*, 2004 VT 27, ¶ 5; see *Peabody v.*

*P.J.'s Auto Village, Inc.*, 153 Vt. 55, 57, 569 A.2d 460, 462 (1989) (stating that deception is measured by an objective standard focusing on the risk of harm to the consumer in a given case). Representations susceptible to multiple reasonable interpretations may violate the Act as long as one of those interpretations is false. *Jordan*, 2004 VT 27, ¶ 5. "Notably, no intent to deceive or mislead need be proven because § 2453(a) requires only proof of an intent to publish." *Id.*; see *Winton v. Johnson & Dix Fuel Corp.*, 147 Vt. 236, 243, 515 A.2d 371, 376 (1986) ("Intentional misrepresentation or bad faith is not required for liability under the act."). An objective standard is also normally used to measure the materiality of the decision. Unless the seller is taking advantage of some peculiarity that makes a given consumer particularly susceptible to an omission or misrepresentation, the question is what a reasonable person would regard as important in making a decision. *Carter v. Gugliuzzi*, 168 Vt. 48, 56, 716 A.2d 17, 23 (1998).

¶ 11. In this case, the Inkels allege that Pride Chevrolet pressured them to give the dealership substantially more money than previously agreed for their purchase of a new truck after (1) quoting them a specific payoff price for their trade-in vehicle based on information that the dealership obtained from the lien holder, (2) assuring them that the lien holder would not seek over-mileage charges on the trade-in, (3) writing the quoted payoff price as the buyout price for the trade-in in the vehicle-purchase contract that the parties signed when they closed the transaction, and (4) failing to prominently display in the contract the provision stating that the Inkels would be required to give the dealership additional funds necessary to cover any mistake regarding the buyout price for the trade-in.[2] We conclude that, if the Inkels were to prove these allegations at trial, a jury could find that Pride Chevrolet engaged in deceptive practices with respect to the sale of the vehicle.

---

[2] On appeal, the Inkels argue that the superior court failed to consider whether Pride Chevrolet engaged in a deceptive trade practice by inserting unconscionable provisions into the vehicle-purchase agreement. Our review of the record does not disclose that the Inkels squarely raised this issue. In any event, on remand, the central issue remaining for the jury will be whether the provision for additional payments resulting in a significant increase in the price of the truck, in light of all of the other circumstances of the case, amounted to an unfair or deceptive act within the meaning of the Consumer Fraud Act.

¶ 12. Practices such as hiding the negative equity in a trade-in, failing to pay off the lien on the trade-in, lowering the agreed price of the trade-in, or otherwise effectively raising the cost of a vehicle after a deal has been consummated are widely recognized as deceptive practices. See J. Sheldon & C. Carter, Unfair and Deceptive Acts and Practices §§ 5.4.4.4-5.4.4.6, at 380-81 (6th ed. 2004); see also 940 Mass. Code Regs. 5.00(10) (except in enumerated circumstances, "[i]t is an unfair or deceptive act or practice for a dealer to increase the price of a motor vehicle after the dealer has accepted an offer to purchase it"). There are a number of reasons why car dealers might want to conceal the negative equity in a leased trade-in, most obviously because many consumers might react by backing out of the deal when they realized the higher bottom-line price they would be paying for the new vehicle. Sheldon & Carter, *supra*, § 5.4.4.4, at 380 ("This practice of hiding negative equity is deceptive because the dealer has misrepresented the true nature of the transaction.").

¶ 13. One treatise notes that a car dealer's failure to pay off the lien on a trade-in is a "surprisingly common" practice that may occur for a number of reasons, *id.* § 5.4.4.5, at 381, including the dealer's later realization that it had assumed a mistaken buyout amount to pay off the lien. See *Tresh v. Mid-Ohio Ford AMC-Jeep-Renault, Inc.*, No. 912, 1989 WL 28691, at *4 (Ohio Ct. App. March 21, 1989) (holding that because the dealer undertook the duty to determine the buyout amount on the leased trade-in, the consumers had the right to rely upon that figure, which the dealer obtained from the leaseholder and set forth in the vehicle-purchase contract). Along these lines, dealers may attempt to renegotiate a car deal "late in the game, claiming they made a 'mistake' in valuing the consumer's trade-in vehicle." Sheldon & Carter, *supra*, § 5.4.4.6, at 381. Dealers may also misrepresent "how the consumer's trade-in is reflected in the transaction" or otherwise fail "to fully credit the consumer for the agreed value of the trade-in." *Id.* § 5.4.8.2, at 426.

¶ 14. The evidence submitted in connection with the parties' cross-motions for summary judgment does not establish what happened in the instant case. Although the superior court stated in a footnote that it was undisputed that the Chittenden Bank was negligent in giving Pride Chevrolet an incorrect payoff amount, Mr. Inkel testified in his deposition that a bank employee told him

that Pride Chevrolet had asked for the wrong payoff amount. Thus, it is not clear whether the Pride Chevrolet employee asked for the wrong information or the bank provided the wrong information. In short, the evidentiary record does not make it clear how the "mistake" occurred or even whether there was a mistake. Further, the principal facts that the superior court apparently relied on in ruling in favor of Pride Chevrolet — that the Inkels knew they had substantial negative equity in their vehicle and that another dealership had recently declined to negotiate with them because of the substantial negative equity in the vehicle — do not necessarily undercut the Inkels' allegation that Pride Chevrolet made, even if good-faith, false and misleading representations actionable under the Consumer Fraud Act by telling them that their lien holder would not seek over-mileage payments on their trade-in.

¶ 15. Given the lack of clarity as to what transpired, summary judgment is inappropriate. Moreover, even if what happened in this case does not fit precisely within the examples of deceptive practices cited above, the evidence described, if believed, does not preclude a jury from reasonably concluding, based on all of the circumstances — including the statements allegedly made to the Inkels and the form of the contract — that Pride Chevrolet's statements and acts regarding its sale of the Tahoe truck to the Inkels were unfair or deceptive. See *Frey v. Vin Devers, Inc.*, 608 N.E.2d 796, 800 (Ohio Ct. App. 1992) (stating that the way a consumer views an act or statement determines whether it is unfair or deceptive — if the seller does or says something that is likely to induce "in the mind of the consumer a belief which is not in accord with the facts, then the act or statement is deceptive").

¶ 16. In *Frey*, the buyers negotiated a vehicle-purchase agreement that included the dealer's buyout of the lease on their trade-in. As in this case, the buyers signed the agreement, took possession of the new vehicle, and turned in their trade-in to the dealer. Weeks later, the dealer informed the buyers that the buyout amount reported to the dealer by the lien holder was incorrect and that the buyers would have to pay the difference, about $1000. The buyers refused to do so and eventually filed suit against the dealer. On appeal, after the dealer prevailed at trial, the Ohio Court of Appeals held that the trial court erred in finding that the dealer did not engage in an unfair or deceptive

practice, given that the relevant regulations included as a deceptive practice raising or attempting to raise a vehicle's actual purchase price, meaning the total amount that the buyer is required to pay the dealer. *Id.*

¶ 17. Although *Frey* does not indicate whether the parties' agreement included a qualifying provision comparable to the one relied on by Pride Chevrolet in this case and quoted above, the existence of such a provision in our case would not necessarily foreclose a jury from finding consumer fraud here. Because "deception can be found where there is no breach of contract or warranty," contract and common law defenses generally do not foreclose consumer-fraud claims. Sheldon & Carter, *supra*, §§ 4.2.15.1, at 178, 4.2.15.4, at 181 (stating that allowing sellers to escape liability for consumer fraud "by placing restrictive terms in written contracts would facilitate fraud[,] . . . make [consumer-fraud] laws a dead letter. . . . [and] fly in the face of research showing that few American adults can understand and use typical contract terms and disclosures"). In sum, notwithstanding the quoted provision contained on the back of the vehicle-purchase agreement in this case, summary judgment on the Inkels' consumer-fraud claims is not appropriate, given the state of the evidence.

¶ 18. Moreover, we reject Pride Chevrolet's argument that the Inkels "affirmed" the vehicle purchase contract by refusing to accept its offer to "wash the deal" after learning of the parties' mutual mistake. See *Will v. Mill Condo. Owners' Ass'n*, 2004 VT 22, ¶ 5, 176 Vt. 380, 848 A.2d 336 (noting that when a contract has been entered into as a result of the parties' mutual mistake regarding a material fact affecting the subject of the agreement, the contract may be avoided by the injured party). Pride Chevrolet offers no direct legal support for this proposition, and, in any event, the evidence does not conclusively prove mutual mistake. "A mutual mistake must be a mistake reciprocally involving both parties, a mistake independently made by each party." *Randolph v. Ottenstein*, 238 F. Supp. 1011, 1014 (D.C. 1965). "A mistake by one party coupled with ignorance thereof does not constitute mutual mistake." *Zurich Ins. Co. v. Bass*, 443 S.W.2d 371, 374 (Tex. Civ. App. 1969).

¶ 19. Given the current state of the record, whether the Inkels merely accepted Pride Chevrolet's statements as true or

took advantage of the dealer's mistaken beliefs, the existence of mutual mistake is questionable at best. See *Jim's Dodge Country v. LeGrande Excavating, Inc.*, 575 N.W.2d 890, 894-95 (Neb. Ct. App. 1998) (evidence that the buyer accepted a mathematical error in his favor with respect to the purchase of a vehicle, even when viewed most favorably to the dealer, did not establish mutual mistake but rather merely that the buyer took advantage of the dealer's mistake); see also *Town of Lyndon v. Burnett's Contracting Co.*, 138 Vt. 102, 107, 413 A.2d 1204, 1207 (1980) ("[W]here the mistake has resulted solely from the negligence or inattention of the party seeking relief, and the other party is without fault, relief will not be granted absent unusual circumstances that would make enforcement of the agreement manifestly unjust."). Further, even assuming that the parties' mistake was mutual, Pride Chevrolet failed to demonstrate that the offer to "wash the deal" was a legitimate offer to rescind the contract. Pride Chevrolet presented no evidence indicating precisely when the offer was made, who made the offer, or what terms, if any, were offered.

¶ 20. While we conclude that Pride Chevrolet's contract defenses did not entitle it to summary judgment on the Inkels' consumer-fraud claims, we also conclude that the Inkels' contract claims are unavailing. Citing the familiar rule that specific and exact contract terms are given greater weight than general contract language, Restatement (Second) of Contracts § 203(c) (1981), the Inkels contend that the superior court gave improper weight to preprinted language on the back of the contract that conflicted with the specific computations on the front of the contract. The problem with this argument is that the preprinted language requiring the Inkels to deliver title for the trade-in and making them responsible for any mistakes as to the amount of liens owed on the trade-in does not necessarily conflict with the computations on the front of the contract; rather, those provisions merely establish responsibilities based on certain contingencies that might arise.

¶ 21. Nor do we find merit in the Inkels' argument that the preprinted language quoted above was an unlawful inconspicuous disclaimer of the warranty of title required by 9A V.S.A. § 2-312(1)(b), which provides that "goods shall be delivered free from any security interest or other lien or encumbrance of which the buyer at the time of contracting has no knowledge." Notwith-

standing the Inkels' allegations that a Pride Chevrolet employee told them that their lien holder would not require them to make over-mileage payments, the Inkels conceded that they had made over-mileage payments in at least one previous lease transaction and that they were aware of the over-mileage on their present trade-in. Moreover, the provision that the Inkels rely upon requires a conspicuous disclaimer of the implied warranty of merchantability rather than the warranty of title. See 9A V.S.A. § 2-316(2); cf. 9A V.S.A. § 2-312(2) (providing that warranty under § 2-312(1) "will be excluded or modified only by specific language" or under circumstances in which the buyer knows that the seller is not claiming title other than that claimed by a third party). To the extent that the challenged provisions can be considered disclaimers to warranty of title, they were stated in specific language in the contract. As indicated earlier, the question for the jury will be whether the manner in which the provisions were set out in the contract, in conjunction with all of the other circumstances of this case, amounted to unfair or deceptive practices.

¶ 22. For the reasons stated above, we reverse the superior court's decisions and remand the matter for trial on the Inkels' consumer-fraud claims. We further remand the matter for the court to consider the Inkels' abuse-of-process and malicious-prosecution claims, which were not addressed in the court's decision. Finally, in the event the Inkels are unsuccessful in their consumer-fraud claims and defendants prevail on their contract claims, the superior court shall consider, in light of all of the relevant facts, whether Mrs. Inkel, not an apparent party to the contract, is subject at all to a judgment in favor of defendants.

*Reversed and remanded.*