### State of Vermont v. James William Stedman a/k/a James William Steadman d/b/a/ Interval Resort Marketing Group, Inc. d/b/a Round Top Resort & Club, et al.

[547 A.2d 1333]

No. 85-214

Present: **Allen, C.J., Peck, J., and Barney, C.J. (Ret.), Keyser, J. (Ret.) and Costello, D.J. (Ret.), Specially Assigned**

Opinion Filed April 29, 1988

*Jeffrey L. Amestoy*, Attorney General, and *Edwin L. Hobson* and *Stephanie J. Kaplan,* Assistant Attorneys General, Montpelier, for Plaintiff-Appellant.

*Michael Marks* and *E. William Leckerling, III,* of *Lisman & Lisman,* Burlington, for Defendants-Appellees.

**Costello, D.J.** (Ret.), Specially Assigned. The State brought the underlying consumer fraud action in connection with an aborted time-sharing scheme at Round Top Mountain Ski Area. After a bench trial, the superior court concluded that defendant Stedman had violated Vermont's Consumer Fraud Act but dismissed the action against defendants David Goldman and V.L.I. Corporation. The State appeals the dismissal, and we affirm.

In October of 1981, defendant James W. Stedman, a real estate developer from Texas, began negotiating a purchase of Round Top Mountain from defendants Goldman and V.L.I. Corporation. Goldman was president and sole stockholder of V.L.I. Corporation and, in effect, the owner and operator of Round Top Mountain. In early November, Stedman and Goldman reached a complex agreement, calling for a substantial down payment, under which ownership of the mountain would be transferred to Stedman. The closing was set for mid-November so that Stedman could arrange financial backing in Texas. Stedman informed Goldman that he intended to institute "time-sharing" at Round Top, an arrangement under which individuals make a fixed payment in return for the long-term right to use lodging facilities for one or more weeks annually.

Just before the closing, Stedman told Goldman that he had been unable to raise the anticipated funds for the down payment but that he was sure his Texas backers would become involved in the project at some time in the future. After further discussion, Goldman agreed to forego the down payment if Stedman would pay him an additional $200,000 in consulting fees. Because Stedman was anxious to take advantage of the impending ski season, the parties reached an interim agreement that gave Stedman a week-to-week license to take possession and operate the ski area pending completion of the sale.

Stedman opened Round Top Ski Area for business during the final days of 1981. He also began selling time-shares by means of an extensive advertising campaign that offered a free day of skiing to potential buyers. Interested individuals were told that Stedman owned the mountain and that he was developing a resort for the exclusive use of time-share owners. They were also

told that buyers would receive complete refunds if they were not satisfied with the facilities upon completion.

While Goldman knew that Stedman was selling time-shares, he did not participate in the sales, he did not meet the buyers, and no one other than Stedman knew that Goldman owned the mountain. Stedman told Goldman that the buyers' deposits on the time-sharing units were being held in escrow until completion of the project. Actually, Stedman was using these deposits to meet the ski area's expenses. By April of 1982, the ski area had closed, and the time-sharing scheme had foundered. Five time-share purchasers testified at trial that they requested refunds of their deposits and had not received them.

On these facts, the trial court concluded that defendant Stedman was liable under Vermont's Consumer Fraud Act because he "induced consumers to enter into timeshare transactions with promises of a money-back guarantee and then reneged on his promises when the project fell apart." As to defendant Goldman, the court acknowledged that his arrangement with Stedman was "unusual and self-serving" because it deprived consumers of a viable means of collecting from Stedman while insulating Goldman from liability. However, the court determined that Goldman was not liable under the Consumer Fraud Act because he was not directly involved in the time-share operation and because he did not know that the deposits were not being placed into escrow accounts.

On appeal, the State argues that the trial court erred, as a matter of law, by predicating its finding of a violation only upon the failure to refund deposits and by failing to include the particular time-share scheme itself. Because the sales scheme was also a violation, the State maintains, the court erred in refusing to hold Goldman liable. We agree with the State's first contention, but we affirm the trial court's judgment.

Vermont's Consumer Fraud Act prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). The purpose of the Act is "to protect citizens from unfair and deceptive acts in consumer transactions." *Wilder* v. *Aetna Life & Casualty Insurance Co.*, 140 Vt. 16, 18, 433 A.2d 309, 310 (1981). In *Poulin* v. *Ford Motor Co.*, 147 Vt. 120, 513 A.2d 1168 (1986), we reviewed judicial and agency standards for determining whether an act or practice is "deceptive" under federal law. Generally, the courts have required "a misrepresentation which has the tendency and

capacity to mislead consumers." *Id.* at 124, 513 A.2d at 1171 (citations omitted). On the other hand, the Federal Trade Commission has stated that " 'a deception case requires a showing of three elements: (1) there must be a representation, practice, or omission likely to mislead consumers; (2) the consumers must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be "material," that is, likely to affect consumers' conduct or decision with regard to a product.' " *Id.* at 124-25, 513 A.2d at 1171-72 (quoting *International Harvester Co.*, 3 Trade Reg. Rep. (CCH) ¶ 22,217, at 23,174, 23,178 (Dec. 21 1984)).

Here, the time-share scheme included both affirmative acts and omissions among the deceptive practices. Stedman and his sales agents actively misrepresented Stedman as the owner of the mountain while failing to reveal Goldman's interest. They also failed to inform the time-share purchasers of the highly speculative nature of the project. The prospective buyer, faced with this sales approach, could reasonably believe that shares of an existing property interest were being offered and that the final conveyance would be contingent only upon the buyer's satisfaction with the completed facilities. Because any consumer's decision regarding a particular purchase is likely to be affected by the state of the seller's purported title, these acts and omissions were significantly misleading. Such a fundamental contingency, if known to the prospective buyer, would affect any price negotiations in addition to the threshold purchase decision. There are implicit risks involved in real estate developments, but these risks should not include the seller's ability to obtain title. We hold that the Consumer Fraud Act was violated through the misrepresentations regarding ownership of the mountain and through the failures to inform prospective buyers of the speculative nature of the time-sharing scheme.*

---

* Although the issue is not before us, it is less clear that Stedman's failure to make the promised refunds was an unfair and deceptive practice within the meaning of the Act. Generally, neither a mere breach of promise, *Miles* v. *Shauntee*, 664 S.W.2d 512, 519 (Ky. 1983), nor a simple breach of contract, *Atlantic Purchasers, Inc.* v. *Aircraft Sales, Inc.*, 705 F.2d 712, 715 (4th Cir.), *cert. denied*, 464 U.S. 848 (1983), qualifies as an unfair or deceptive act under consumer fraud statutes. As long as Stedman's refund promises were made in good faith, his actions in this regard may not have been so deceptive or unfair as to constitute consumer fraud. See *Solomon v. Pendaries Properties, Inc.*, 623 F.2d 602, 604 (10th Cir. 1980) (no consumer protection violation under federal Land

We affirm, nevertheless, the trial court's dismissal of the action against defendants Goldman and V.L.I. The State argues that Goldman is liable for the consumer fraud violation because he knew and approved of the time-share sales and allowed Stedman to use the mountain for his deceptive practices. We can find no case, however, in which derivative liability for consumer fraud has been imposed absent direct participation in the unfair or deceptive acts, direct aid to the actor, or a principal/agent relationship. Compare *Bourland* v. *State*, 528 S.W.2d 350 (Tex. Ct. App. 1975) (attorney active participant in deceptive practices of client), and *Jurgens* v. *Abraham*, 616 F. Supp. 1381 (D. Mass. 1985) (attorney directly aided perpetration of deceptive acts), with *Jackson* v. *Harkey*, 41 Wash. App. 472, 704 P.2d 687 (1985) (principal who has engaged in, is aware of, or has condoned deceptive acts of his agents is liable under consumer protection act).

The State cites *Goodman* v. *Federal Trade Commission*, 244 F.2d 584 (9th Cir. 1957), in which the court noted that courts interpreting the Federal Trade Commission Act "have stressed that one who 'places in the hands of another a means of consummating a fraud or competing unfairly in violation of the Federal Trade Commission is himself guilty of a violation of the Act.'" *Id.* at 591 (quoting *C. Howard Hunt Pen Co.* v. *Federal Trade Commission*, 197 F.2d 273, 281 (3d Cir. 1952)). But this doctrine concerns a particular variety of "direct aid" cases. For example, *Goodman* involved an individual who recruited sales agents for his deceptively packaged reweaving course and trained them to employ deceptive sales techniques. The court's conclusion of liability is based upon agency relationships and the doctrine of apparent authority. Here, in contrast, no principal/agent relationship has been shown, and the time-share buyers were unaware of Goldman's existence. In other like cases, derivative liability has been imposed for providing individuals with a deceptive sales method and encouraging its use, *In re National Housewares, Inc.*, 90 F.T.C. 512, 590 (1977), for altering a product to facilitate deceptive sales by another, *C. Howard Hunt Pen Co.* v. *Federal Trade Commission*, 197 F.2d at 281, and for franchising a business activity that is inherently illegal, *In re Howard Enterprises, Inc.*, 93 F.T.C. 909, 940-41 (1979). All of these cases involve a de-

Sales Act where developer failed to complete facilities as promised in good faith at time of sale).

gree of direct involvement not present here. The trial court did not err in dismissing the action against defendants Goldman and V.L.I.

Finally, the State challenges the lower court's refusal to make certain findings of fact requested at trial. The facts outlined by the State are relevant only to Goldman's knowledge of the time-share sales, his occasional presence at the scene, and his knowledge of Stedman's cash flow difficulties. In light of our above holding, it is unnecessary to resolve this issue.

*Affirmed.*