2013 VT 106

**Janet Knutsen v. David M. Dion, Thomas Gardner, David M. Dion Real Estate, Inc., and Vermont Association of Realtors, Inc.**

[90 A.3d 866]

No. 12-294

Present: **Dooley, Skoglund and Burgess, JJ., and Howard and Bent, Supr. JJ., Specially Assigned.**

Opinion Filed November 8, 2013

Motion for Reargument Denied January 23, 2014

*Kimberly B. Cheney* of *Cheney Saudek & Grayck PC*, Montpelier, for Plaintiff-Appellant.

*Thomas F. Heilmann* and *David D. Aman* of *Heilmann, Ekman & Associates, Inc.*, Burlington, for Defendant-Appellee Vermont Association of Realtors, Inc.

¶ 1. **Dooley, J.** Plaintiff Janet Knutsen appeals the decision of the superior court denying her motion for summary judgment and granting defendant Vermont Association of Realtors, Inc.'s (VAR) motion for summary judgment on her consumer fraud claim arising out of her purchase of a home in Moretown. Plaintiff argues that VAR's form purchase and sale agreement, which was used in her real estate purchase — to which VAR was not a party — violates the Vermont Consumer Fraud Act (CFA) in that two provisions of the form are unfair and deceptive, and that she is therefore entitled to damages under § 2461(b) of the CFA. We affirm.

¶ 2. On May 20, 2007, plaintiff entered into a purchase and sales contract with Lorraine and Leonard Sweetser (sellers) for the purchase of their home. Sheila Jacobs, plaintiff's broker, prepared the contract. The contract contained the following limitation of liability:

> **Limitation of Liability:** *Seller and Purchaser each agree that the real estate brokers identified in Section 31 hereof have provided both Seller and Purchaser with benefits, services, assistance and value in bringing about this Contract. In consideration thereof, and in recognition of the relative risks, rewards, compensation and benefits*

**arising from this transaction to said real estate brokers, Seller and Purchaser each agree that such brokers, their agents, associates or affiliates, shall in no event be liable to either Purchaser, Seller or both, either jointly, severally or individually, in an aggregate amount exceeding the total compensation to be paid to such brokers on account of this transaction or $5,000, whichever is greater, by reason of any act or omission, including negligence, misrepresentation, errors and omissions, or breach of any undertaking whatsoever, except for intentional or willful acts.** *This limitation shall apply regardless of the cause of action or legal theory asserted against the real estate brokers unless the claim is for an intentional or willful act. This limitation of liability shall apply to all claims, losses, costs, damages or claimed expenses of any nature whatsoever from any cause or causes, except intentional or willful acts, so that the total aggregate liability of all real estate brokers identified in Section 31 hereof shall not exceed the amount set forth herein. Seller and Purchaser each agree that there is valid and sufficient consideration for this limitation of liability and that the real estate brokers are the intended third-party beneficiaries of this provision.*

(bolding and emphasis in original). Plaintiff initialed and dated the page containing the limiting language and signed the contract. The above section provided a liability limitation to "real estate brokers identified in section 31" of the contract. The brokers identified in section 31 are the firms for which sellers' and buyer's agents worked.

¶ 3. The contract also contained a clause calling for presuit mediation of disputes related to the contract. The mediation provision stated:

**Mediation of Disputes:** In the event of any dispute or claim arising out of or relating to this Contract, to the Property, or to the services provided to either Seller or Purchaser by any real estate agent who brought about this Contract, it is agreed that such dispute or claim shall be submitted to mediation prior to the initiation of any suit. The party seeking to mediate such dispute or claim shall provide notice to the other party and/or to the

real estate agent(s) with whom mediation is sought and thereafter the parties and/or real estate broker(s) to be involved in the mediation shall reasonably cooperate with each other in the selection of a mediator and shall reasonably agree upon the selection of a mediator. The real estate agent(s) who brought about this Contract can be of assistance in providing information as to sources for obtaining the services of a mediator. Unless otherwise agreed to in writing, the parties and any real estate agent(s) involved in the mediation shall share the mediator's fee equally. Seller, Purchaser and the real estate agent(s) who brought about this Contract acknowledge and understand that, although utilizing mediation in an effort to resolve any dispute or claim is mandatory under this Contract, the function of the mediator is to assist the parties involved in the mediation in resolving such dispute or claim and not to make a binding determination or decision concerning the dispute or claim. This provision shall be in addition to, and not in replacement of, any mediation or alternative dispute resolution system required by an order or rule of court in the event the dispute results in a lawsuit.

(bolding in original). Like the limitation of liability provision, plaintiff initialed and dated the page containing the mediation provision.

¶ 4. Although plaintiff's broker prepared the purchase and sales contract, she used a template that VAR provided on its website. VAR is a Vermont trade organization comprised of more than 1800 licensed real estate brokers and salespersons. VAR makes available to its members generic, preprinted real estate forms, including a purchase and sales contract form that a member can use as a template. VAR recommends the form to those involved in a real estate sale. The purchase and sales agreement form can be modified to meet the specifics of the agreement for any given purchase and sales transaction. The website page plaintiff attached to her motion for summary judgment indicates that VAR provides forms "through TrueForms."[*] We take this to mean that

---

[*] The website states: "TrueForms helps simplify the forms and contracts process and allows members to conduct transactions efficiently, protecting the interest of all parties." The website also calls the forms "Approved." While plaintiff emphasizes

the forms actually come from some external source, although the bottom of the form states, "This form developed by the Vermont Association of Realtors, Inc."

¶ 5. Approximately one month prior to the closing on the contract, sellers presented plaintiff with a Sellers' Property Information Report (SPIR). The SPIR notified plaintiff that "[t]his year the water table was extremely high; water seeped in at various places where cracks are visible. Controlled with wet/dry vac. Sump pump takes care of water during early spring [and] does not reach concrete." Plaintiff initialed the page of the SPIR containing this disclosure and signed the SPIR. She disregarded her broker's suggestion to have the contract reviewed by an attorney.

¶ 6. In the years after the closing, plaintiff experienced water infiltration in the basement of the house. Plaintiff brought suit against sellers, the home inspector, and sellers' real estate brokers and their real estate agency, alleging that she had purchased the home based on misrepresentations about the water infiltration problem. She settled with sellers and with the home inspector, and the trial court dismissed the case against sellers' real estate brokers, and their agency, for failure to comply with the presuit-mediation clause of the contract. Plaintiff refiled her action, again suing sellers' real estate agency and their realtors, and adding as defendants VAR, her broker, and her broker's agency. Plaintiff's claims against her broker and the agency were voluntarily dismissed with prejudice.

¶ 7. The claim against VAR was based on the two clauses in the form contract quoted above — the limited liability clause and the mandatory mediation clause. Plaintiff argued that those clauses were unfair and deceptive, and that by providing the form contract and representing on its website that the template is fair to all parties, VAR violated the CFA. She therefore sought damages under 9 V.S.A. § 2461(b), the private right of action under the CFA. Both plaintiff and VAR filed motions for summary judgment on the CFA claims. The trial court ruled that the clauses, either alone or in conjunction, were not "unfair or deceptive under the CFA." It therefore found that "VAR's sole

these representations, there is no allegation that they were seen by plaintiff. Nor is it clear that the website page is available to the public, rather than just to members.

connection to this case — drafting the template clauses that [plaintiff] and her buyer's broker eventually used — cannot support a consumer fraud claim" and granted VAR's motion for summary judgment. This appeal followed, and plaintiff's claims against sellers' realtors, and their agency, have been stayed pending its resolution.

¶ 8. We review a grant of summary judgment using the same standard of review applied by the trial court. *Al Baraka Bancorp (Chicago), Inc. v. Hilweh*, 163 Vt. 148, 153, 656 A.2d 197, 200-01 (1994). "Summary judgment is appropriate only where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law." *Samplid Enters., Inc. v. First Vt. Bank*, 165 Vt. 22, 25, 676 A.2d 774, 776 (1996); V.R.C.P. 56(a).

¶ 9. On appeal, the only issue is plaintiff's CFA claim against VAR. Plaintiff argues that the trial court erred by "rel[ying] on a factual conclusion that [plaintiff] freely entered into a contract and, hence, there was . . . no need to examine the VCFA." Plaintiff points us to the section of the CFA that provides that "[n]o actual damage to any person need be alleged or proven for an action to lie under this chapter." 9 V.S.A. § 2457. Plaintiff objects to the trial court's observation that plaintiff was not harmed because she had not been deceived by the challenged provisions and because her damages could be satisfied even under the limitation of liability provision. Plaintiff calls the violation a "per se" violation of the CFA, which she interprets as meaning that no damages must be shown in order to bring a private claim.

¶ 10. We start by considering whether VAR is liable for the conduct alleged. VAR was not involved in the transaction between plaintiff and sellers, nor in the actions of the real estate brokers who represented sellers and plaintiff and brought them to agreement. VAR's sole involvement was to post on its website a model purchase and sales contract that could be used by member real estate brokers and was used by plaintiff's real estate broker.

¶ 11. The CFA makes unlawful "[u]nfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). The attorney general, or an authorized state's attorney, may bring an action against a "person . . . using or . . . about to use any method, act, or practice declared by section 2453 of this title to be unlawful." *Id.* § 2458(a). Possible remedies include an injunction to stop the unlawful conduct, a civil

penalty and restitution. *Id.* § 2458(a)-(b)(2). The private remedy section of the CFA authorizes a consumer "who sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 of this title" to "sue and recover from the seller, solicitor, or other violator the amount of his or her damages, or the consideration or the value of the consideration given by the consumer." *Id.* § 2461(b). Narrowly stated, the first issue in this case is whether, under plaintiff's allegations, VAR is an "other violator" pursuant to § 2461(b).

¶ 12. This is not the first case to look at the issue of derivative liability under the CFA. In *State v. Stedman*, 149 Vt. 594, 547 A.2d 1333 (1988), the attorney general brought a consumer fraud action against a person who was selling time shares in lodging at a ski area in southern Vermont. After a deal to buy the ski area from its owner fell through, the time-share seller and the ski-area owner entered into a contract whereby the time-share seller received a week-by-week license to take possession and operate the ski area. Once he received the license, the seller sold time shares, taking downpayments that he used to operate the ski area with the promise that the buyers would receive a complete refund if not satisfied with the facilities. The purchasers lost their downpayments when the scheme failed.

¶ 13. ▮▮ The attorney general sued both the time-share seller and the ski-area owner. The trial court found as to the latter that, although he was not directly involved with the time-share sales and believed that the deposit payments were being placed in escrow, he violated the CFA by creating an arrangement that deprived the time-share purchasers of any viable means to collect from the seller and that allowed the seller "to use the mountain for his deceptive practices." *Id.* at 598, 547 A.2d at 1335. We held that derivative liability for consumer fraud could not be imposed "absent direct participation in the unfair or deceptive acts, direct aid to the actor, or a principal/agent relationship." *Id.* at 598, 547 A.2d at 1335-36.

¶ 14. Particularly relevant to this case is this Court's discussion in *Stedman* of "direct aid to the actor" in light of the decision in *Goodman v. Federal Trade Commission*, 244 F.2d 584 (9th Cir. 1957). *Goodman* generalized that "one who 'places in the hands of another a means of consummating a fraud or competing unfairly in violation of the Federal Trade Commission Act is himself guilty

of a violation of the Act.' " *Id.* at 591 (citation omitted). We noted that this principle applied in cases involving principal/agency relationships and the doctrine of apparent authority. Thus, it did not provide liability for the ski-area owner, who was not in a principal/agent relationship with the time-share seller and was unknown to the purchasers. *Stedman,* 149 Vt. at 598, 547 A.2d at 1336. Similarly, we found that other derivative-liability cases did not help the State because they all "involve a degree of direct involvement not present here." *Id.* at 598-99, 547 A.2d at 1336.

¶ 15. *Stedman* remains the last word on liability limitations in suits by the attorney general pursuant to 9 V.S.A. § 2458(a). Further developments on defining the actors subject to liability occur in the context of § 2461(b), the private remedy section. In *Carter v. Gugliuzzi,* 168 Vt. 48, 49, 716 A.2d 17, 19 (1998), we held that the purchaser of a home could bring a CFA action against the real estate broker for the seller for damages caused by misrepresentations made during the selling process. Citing the remedial purpose of the statute and our policy of construing the statute liberally, we held that the term "seller" in the private remedy section of the CFA includes real estate brokers who sell the property as agents for the owner. *Id.* at 53, 716 A.2d at 22. In *Elkins v. Microsoft Corp.,* 174 Vt. 328, 817 A.2d 9 (2002), we again examined the meaning of the private remedy section in the context of an antitrust claim against a software manufacturer that sold a computer operating system to a computer manufacturer, which bundled it with the computer hardware for sale to consumers. Again citing the broad remedial purpose of the CFA, we held that the consumer could sue the software producer, despite the absence of privity, as an "other violator" as provided in § 2461(b). *Id.* at 331, 341, 817 A.2d at 13, 20.

¶ 16. The most complete explanation of this line of cases is in *Sawyer v. Robson,* 2006 VT 136, 181 Vt. 216, 915 A.2d 1298, where a tenant sued a landlord for violations of the CFA. We held that the tenant could sue the landlord as an "other violator" where "there was evidence landlords had engaged in unfair and deceptive commercial practices." *Id.* ¶ 13. We stated our rationale broadly: "The plain meaning of 'other violator' is anyone engaged in an unfair or deceptive commercial practice in violation of the CFA's prohibition on such activity." *Id.* ¶ 12. We explained that "our focus in determining applicability of the CFA is the nature of the alleged violator's activities, not whether the violator falls into a defined statutory category." *Id.*

¶ 17. Plaintiff interprets the line of § 2461(b) cases as authorizing a type of private attorney general that can pursue CFA violations irrespective of whether that consumer is harmed by them. She argues that she can pursue a CFA violation against any "violator," including VAR, irrespective of whether VAR's actions actually harmed her.

¶ 18. The main difficulty with plaintiff's argument is that it gives the private attorney general — her — more power than the public official attorney general. Plaintiff's argument also ignores the requirement that the consumer must sustain damages or injury as a result of practices prohibited by § 2453.

¶ 19. ■ ■ It is the first difficulty, however, that primarily drives our resolution of the question before us. There is no indication that the Legislature intended that a private action be available where the attorney general cannot pursue a public action. The private right of action was intended to supplement the public right of action, not to replace it. For this reason, we conclude that the *Stedman* holding applies both to public CFA suits and to private CFA suits like the one before us. We note that the United States District Court has applied *Stedman* in this way. See *Repucci v. Lake Champagne Campground, Inc.*, 251 F. Supp. 2d 1235, 1241 (D. Vt. 2002); *Vt. Mobile Home Owners' Ass'n v. Lapierre*, 94 F. Supp. 2d 519, 526 (D. Vt. 2000). Thus, VAR cannot be found liable "absent direct participation in the unfair or deceptive acts, direct aid to the actor, or a principal/agent relationship." *Stedman*, 149 Vt. at 598, 547 A.2d at 1335-36. The application of this test in private CFA cases is appropriate because it looks to "the nature of the alleged violator's activities, not whether the violator falls into a defined statutory category." *Sawyer*, 2006 VT 136, ¶ 12.

¶ 20. ■ VAR had no direct involvement in the drafting of the contract used here and did not act as a principal with respect to plaintiff's broker. Thus, it may only be held liable if it provided "direct aid" to the broker. In *Stedman* we defined "direct aid to the actor" in a way that required some direct involvement in the transaction at issue.

¶ 21. In fact, VAR's involvement here was much less direct than that of the ski area owner in *Stedman*. In that case, the owner participated in a unique hidden economic relationship with the time-share seller that allowed the seller to defraud purchasers

with no recourse. Here, a broker obtained a form from VAR that she could have obtained from many sources — for example, a lawyer, a form book, or a public internet source. The broker, not VAR, selected the language to propose in the contract for sale, and the consumer agreed to that language. Assuming that the language is deceptive and that plaintiff can show damages or injury, she has a remedy against her broker under the CFA. She also may contest the validity of the provision against any broker who relies upon the allegedly-invalid terms.

¶ 22. Plaintiff points us to one decision that she argues supports her view that VAR should be liable under the CFA, *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010). We find *Neovi* distinguishable and unhelpful. In that case, the defendant was a firm that offered check-writing services for consumers through a website. The firm's information-gathering system lacked basic security, so that unauthorized persons could write checks on customer accounts. Over fifty percent of the amount of the checks written in the six years the company operated was fraudulent. Acting on thousands of complaints, the FTC successfully sued to shut the company down. Plaintiff argues that *Neovi* is like this case because Neovi "permitted consumers to be victimized, even if it was not itself part of a dishonest transaction." Of course, in *Neovi*, the consumers involved were the company's customers, so the company was directly involved in the fraudulent transactions. As the Ninth Circuit said, the defendant "controlled a system that facilitated fraud and . . . the company was on notice as to the high fraud rate." Allowing Neovi to escape liability on the grounds that its users, and not Neovi, created the fraudulent checks "would immunize a website operator that turned a blind eye to fraudulent business made possible only through the operator's software." *Id.* at 1155. Here, there is no direct relationship between plaintiff and VAR. Nor is there any claim of widespread negative impact on consumers from the VAR forms. Neither the rationale nor the result in *Neovi* is helpful in analyzing VAR's conduct here.

¶ 23. We can find no case law holding the operator of a website liable because that site contains forms with contractual provisions that, if used by third parties at their election, may cause violations of the CFA. Plaintiff points us to no such precedent. We note, however, that cases interpreting other states' statutes similar to the CFA are generally consistent with *Stedman*, in that other jurisdictions usually require a person or entity that is liable for a

violation to have direct involvement in the fraudulent conduct that creates the violation.

¶ 24. Two decisions from Maryland appellate courts illustrate this principle. In *MRA Property Management, Inc. v. Armstrong*, 43 A.3d 397 (Md. 2012), the plaintiffs purchased condominium units from prior owners and, in the course of the sales, received information from the condominium owners' association and the property management company on the annual maintenance costs. The cost information turned out to be understated because all of the units faced undisclosed major repair expenses due to water damage caused by improper construction. After the purchases, the new owners were required to pay a large special assessment for repairs. There was, of course, no contractual relationship between the purchasers and either the owners' association or the property management company. Nevertheless, the purchasers sued the association and the management company under Maryland's consumer protection act.

¶ 25. In analyzing whether the defendants could be held liable, the Maryland Court of Appeals drew on an earlier decision, stating " '[i]t is quite possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale.' " *Id.* at 412 (quoting *Morris v. Osmose Wood Preserving*, 667 A.2d 624, 635 (Md. 1995)). The court stated that it "is not dispositive" that a defendant is not "a direct seller." *Id.* at 412-13. The court held that the association and the management company could be held liable under Maryland's consumer protection act because "the operating budgets provided by MRA and the Association could have sufficiently implicated them in the entire transaction so as to impose liability under the Consumer Protection Act, given that every plaintiff averred . . . that he or she would not have purchased a unit if the budget provided by MRA and the Association had disclosed the expenses necessary to correct the problems with the condominium buildings." *Id.* at 413.

¶ 26. In reaching its conclusion, the court distinguished the decision of Maryland's Special Court of Appeals in *Hogan v. Maryland State Dental Ass'n*, 843 A.2d 902 (Md. Ct. Spec. App. 2004), in which dental patients who had received fillings containing mercury from their dentists sued the state dental association, and its national counterpart, under Maryland's consumer protection

act for withholding and suppressing information about the toxicity of mercury fillings. The *Hogan* court held that the dental associations were not merchants who could be sued under Maryland's consumer protection act because plaintiffs did not allege that they "manufactured, sold, distributed, implanted, or otherwise participated in the sale of dental fillings in a manner that would support liability under the Act." *Id.* at 906. The court did not find sufficient a general claim that the associations "took 'an active role in controlling' how member dentists practiced their profession." *Id.*

¶ 27. Consistent with the *Stedman* rationale, this case is like *Hogan* and unlike *MRA* primarily because VAR had no direct involvement in the consumer transaction that allegedly violated the CFA. In various contexts under comparable statutory schemes, other courts have similarly required some direct involvement for derivative liability to attach under a consumer protection act. See, e.g., *Jurgens v. Abraham*, 616 F. Supp. 1381, 1386-87 (D. Mass. 1985) (holding that a real estate developer who contracted with a company to find a lender stated claims under state consumer fraud act against two lawyers, where an officer of the company absconded with plaintiff's earnest money that was to be put in escrow, because one lawyer "made false and misleading representations to plaintiff to induce him to enter into an agreement designed to defraud him of a substantial sum of money" and the second lawyer "directly aided [the officer] in absconding with the earnest money"); *State v. Cottman Transmissions Sys., Inc.*, 587 A.2d 1190, 1202 (Md. Ct. Spec. App. 1991) (holding that franchisor of transmission repair shops could be held liable to customers of franchisees under state consumer protection act where franchisor required franchisees to provide unnecessary repairs, but not for instances where franchisees charged for fictitious repairs without direction from franchisor); *Ramapo Brae Condo. Ass'n v. Bergen Cty. Hous. Auth.*, 746 A.2d 519, 530 (N.J. Super. Ct. App. Div. 2000) (holding architect of condominium development not liable to purchaser under state consumer protection act for improper construction where architect was not involved as a principal or as a retained principal in a real estate marketing venture but whose services were held out as part of what was sold); *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 561 (N.C. Ct. App. 2012) (holding that operator of an internet marketplace for purchase and sales of sports and event tickets is protected by § 230 of the Communications Decency Act, 47 U.S.C. § 230, from

consumer fraud liability when third parties sell tickets at prices above those allowed by North Carolina law because the website does not "control the content posted by those third parties or take other actions which essentially ensure the creation of unlawful material"); *Schmidt v. Cornerstone Invs., Inc.*, 795 P.2d 1143, 1151 (Wash. 1990) (holding that private investors in a commercial real estate purchase, the price of which was based on a fraudulent appraisal, could not hold the lawyer for the purchaser liable for consumer fraud because he had no contact with the appraiser and was not involved in soliciting plaintiff's investment).

¶ 28. ██ In sum, the trial court correctly held that "VAR's sole connection to this case — drafting the template clauses that [plaintiff] and her buyer's broker eventually used — cannot support a consumer fraud claim." For that reason, the court properly granted summary judgment to VAR.

*Affirmed.*