2013 VT 106



Knutson v. Dion, Gardner, Vermont
Association of Realtors, Inc. (2012-294)

 

2013 VT 106

 

[Filed 08-Nov-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 106
 
  


 No. 2012-294
 
  


 Janet Knutsen
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Washington
 Unit,
 
 
  
 
 
 Civil Division
 
 
  
 
 
  
 
 
 David M. Dion, Thomas Gardner,
 David M. Dion 
 Real Estate, Inc., and Vermont Association of Realtors,
 Inc.
 
 
 March Term, 2013
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Michael
 S. Kupersmith, J.
 
 
  
 
 Kimberly B. Cheney of Cheney Saudek
& Grayck PC, Montpelier, for Plaintiff-Appellant.

 

Thomas F. Heilmann and David D. Aman of Heilmann, Ekman & Associates, Inc., Burlington, 

  for Defendant-Appellee Vermont Association of Realtors, Inc.

 

 

PRESENT:   Dooley, Skoglund
and Burgess, JJ., and Howard and Bent, Supr., JJ., 

                    
Specially Assigned

 

 

¶
1.            
DOOLEY, J.   Plaintiff Janet Knutsen
appeals the decision of the superior court denying her motion for summary
judgment and granting defendant Vermont Association of Realtors, Inc.’s (VAR)
motion for summary judgment on her consumer fraud claim arising out of her
purchase of a home in Moretown.  Plaintiff argues that VAR’s form purchase
and sale agreement, which was used in her real estate purchase—to which VAR was
not a party—violates the Vermont Consumer Fraud Act (CFA) in that two
provisions of the form are unfair and deceptive, and that she is therefore
entitled to damages under § 2461(b) of the CFA.  We affirm.

¶
2.            
On May 20, 2007, plaintiff entered into a purchase and sales contract
with Lorraine and Leonard Sweetser (sellers) for the
purchase of their home.  Sheila Jacobs, plaintiff’s broker,
prepared the contract.  The contract contained the following limitation of
liability:

 
Limitation of Liability:  Seller and Purchaser each agree that
the real estate brokers identified in Section 31 hereof have provided both
Seller and Purchaser with benefits, services, assistance and value in bringing
about this Contract.  In consideration thereof, and in recognition of the
relative risks, rewards, compensation and benefits arising from this
transaction to said real estate brokers, Seller and Purchaser each agree
that such brokers, their agents, associates or affiliates, shall in no event be
liable to either Purchaser, Seller or both, either jointly, severally or
individually, in an aggregate amount exceeding the total compensation to be
paid to such brokers on account of this transaction or $5,000, whichever is
greater, by reason of any act or omission, including negligence,
misrepresentation, errors and omissions, or breach of any undertaking
whatsoever, except for intentional or willful acts.  This limitation
shall apply regardless of the cause of action or legal theory asserted against
the real estate brokers unless the claim is for an intentional or willful
act.  This limitation of liability shall apply to all claims, losses,
costs, damages or claimed expenses of any nature whatsoever from any cause or
causes, except intentional or willful acts, so that the total aggregate
liability of all real estate brokers identified in Section 31 hereof shall not
exceed the amount set forth herein.  Seller and Purchaser each agree that
there is valid and sufficient consideration for this limitation of liability
and that the real estate brokers are the intended third-party beneficiaries of
this provision.  

 

(bolding and emphasis in original).  Plaintiff
initialed and dated the page containing the limiting language and signed the
contract.  The above section provided a liability limitation to “real
estate brokers identified in section 31” of the contract.  The brokers
identified in section 31 are the firms for which sellers’ and buyer’s agents
worked. 

¶
3.            
The contract also contained a clause calling for pre-suit mediation of
disputes related to the contract.  The mediation provision stated:

 
Mediation of Disputes:  In the event of any dispute or claim arising
out of or relating to this Contract, to the Property, or to the services
provided to either Seller or Purchaser by any real estate agent who brought
about this Contract, it is agreed that such dispute or claim shall be submitted
to mediation prior to the initiation of any suit.  The party seeking to
mediate such dispute or claim shall provide notice to the other party and/or to
the real estate agent(s) with whom mediation is sought and thereafter the
parties and/or real estate broker(s) to be involved in the mediation shall
reasonably cooperate with each other in the selection of a mediator and shall
reasonably agree upon the selection of a mediator.  The real estate
agent(s) who brought about this Contract can be of assistance in providing
information as to sources for obtaining the services of a mediator. 
Unless otherwise agreed to in writing, the parties and any real estate agent(s)
involved in the mediation shall share the mediator’s fee equally.  Seller,
Purchaser and the real estate agent(s) who brought about this Contract
acknowledge and understand that, although utilizing mediation in an effort to
resolve any dispute or claim is mandatory under this Contract, the function of
the mediator is to assist the parties involved in the mediation in resolving
such dispute or claim and not to make a binding determination or decision
concerning the dispute or claim.  This provision shall be in addition to,
and not in replacement of, any mediation or alternative dispute resolution
system required by an order or rule of court in the event the dispute results
in a lawsuit.

 

 (bolding in original).  Like the limitation of
liability provision, plaintiff initialed and dated the page containing the
mediation provision.  

¶
4.            
Although plaintiff’s broker prepared the purchase and sales contract, she
used a template that VAR provided on its website.  VAR is a Vermont trade
organization comprised of more than 1800 licensed real estate brokers and
salespersons.  VAR makes available to its members generic, pre-printed
real estate forms, including a purchase and sales contract form that a member
can use as a template.  VAR recommends the form to those involved in a
real estate sale.  The purchase and sales agreement form can be modified
to meet the specifics of the agreement for any given purchase and sales
transaction.  The website page plaintiff attached to her motion for
summary judgment indicates that VAR provides forms “through TrueForms.”* 
We take this to mean that the forms actually come from some external source,
although the bottom of the form states, “This form developed by the Vermont
Association of Realtors, Inc.”

¶
5.            
Approximately one month prior to the closing on the contract, sellers
presented plaintiff with a Sellers’ Property Information Report (SPIR). 
The SPIR notified plaintiff that “[t]his year the water table was extremely
high; water seeped in at various places where cracks are visible.  Controlled with wet/dry vac.  Sump pump takes care of
water during early spring [and] does not reach concrete.”  Plaintiff
initialed the page of the SPIR containing this disclosure and signed the
SPIR.  She disregarded her broker’s suggestion to have the contract
reviewed by an attorney.

¶
6.            
In the years after the closing, plaintiff experienced water infiltration
in the basement of the house.  Plaintiff brought suit against sellers, the
home inspector, and sellers’ real estate brokers and their real estate agency,
alleging that she had purchased the home based on misrepresentations about the water
infiltration problem.  She settled with sellers and with the home
inspector, and the trial court dismissed the case against sellers’ real estate
brokers, and their agency, for failure to comply with the pre-suit-mediation
clause of the contract.  Plaintiff refiled her
action, again suing sellers’ real estate agency and their realtors, and adding
as defendants VAR, her broker, and her broker’s agency.  Plaintiff’s
claims against her broker and the agency were voluntarily dismissed with
prejudice. 

¶
7.            
The claim against VAR was based on the two clauses in the form contract
quoted above—the limited liability clause and the mandatory mediation
clause.  Plaintiff argued that those clauses were unfair and deceptive,
and that by providing the form contract and representing on its website that
the template is fair to all parties, VAR violated the CFA.  She therefore
sought damages under 9 V.S.A. § 2461(b), the private right of action
under the CFA.  Both plaintiff and VAR filed motions for summary judgment
on the CFA claims.  The trial court ruled that the clauses, either alone
or in conjunction, were not “unfair or deceptive under the CFA.”  It
therefore found that “VAR’s sole connection to this case—drafting the template
clauses that [plaintiff] and her buyer’s broker eventually used—cannot support
a consumer fraud claim” and granted VAR’s motion for summary judgment. 
This appeal followed, and plaintiff’s claims against sellers’ realtors, and
their agency, have been stayed pending its resolution.

¶
8.            
We review a grant of summary judgment using the same standard of review
applied by the trial court.  Al Baraka Bancorp
(Chicago), Inc. v. Hilweh, 163 Vt. 148, 153, 656
A.2d 197, 200-01 (1994).  “Summary judgment is appropriate only
where the moving party establishes that there is no genuine issue of material
fact and that the party is entitled to judgment as a matter of law.”  Samplid Enters., Inc. v. First
Vt. Bank, 165 Vt. 22,
25, 676 A.2d 774, 776 (1996); V.R.C.P. 56(a).

¶ 9.            
On appeal, the only issue is plaintiff’s CFA claim against VAR. 
Plaintiff argues that the trial court erred by “rel[ying]
on a factual conclusion that [plaintiff] freely entered into a contract and,
hence, there was . . . no need to examine the VCFA.” 
Plaintiff points us to the section of the CFA that provides that “[n]o actual
damage to any person need be alleged or proven for an action to lie under this
chapter.”  9 V.S.A. § 2457. 
Plaintiff objects to the trial court’s observation that plaintiff was not
harmed because she had not been deceived by the challenged provisions and
because her damages could be satisfied even under the limitation of liability
provision.  Plaintiff calls the violation a “per se” violation of the CFA,
which she interprets as meaning that no damages must be shown in order to bring
a private claim.

¶ 10.         We
start by considering whether VAR is liable for the conduct alleged.  VAR
was not involved in the transaction between plaintiff and sellers, nor in the
actions of the real estate brokers who represented sellers and plaintiff and
brought them to agreement.  VAR’s sole involvement was to post on its
website a model purchase and sales contract that could be used by member real
estate brokers and was used by plaintiff’s real estate broker.  

¶ 11.         The
CFA makes unlawful “[u]nfair methods of competition
in commerce, and unfair or deceptive acts or practices in commerce.”  9 V.S.A. § 2453(a).  The attorney general, or an
authorized state’s attorney, may bring an action against a “person
. . . using or . . . about to use any method, act or
practice declared by section 2453 of this title to be unlawful.”  Id. § 2458(a).  Possible remedies include
an injunction to stop the unlawful conduct, a civil penalty and
restitution.  Id. § 2458(a)-(b)(2). 
The private remedy section of the CFA authorizes a consumer “who sustains
damages or injury as a result of any false or fraudulent representations or
practices prohibited by section 2453 of this title” to “sue and recover from
the seller, solicitor or other violator the amount of his damages, or the
consideration or the value of the consideration given by the consumer.”  Id. § 2461(b).  Narrowly stated, the first
issue in this case is whether, under plaintiff’s allegations, VAR is an “other
violator” pursuant to § 2461(b). 

¶ 12.         This
is not the first case to look at the issue of derivative liability under the
CFA.  In State v. Stedman, 149 Vt. 594, 547 A.2d 1333 (1988), the
attorney general brought a consumer fraud action against a person who was
selling time shares in lodging at a ski area in southern Vermont.  After a
deal to buy the ski area from its owner fell through, the time-share seller and
the ski-area owner entered into a contract whereby the time-share seller received
a week-by-week license to take possession and operate the ski area.  Once
he received the license, the seller sold time shares, taking downpayments that he used to operate the ski area with the
promise that the buyers would receive a complete refund if not satisfied with
the facilities.  The purchasers lost their downpayments
when the scheme failed.

¶ 13.         The
Attorney General sued both the time-share seller and the ski-area owner. 
The trial court found as to the latter that, although he was not directly
involved with the time-share sales and believed that the deposit payments were
being placed in escrow, he violated the CFA by creating an arrangement that
deprived the time-share purchasers of any viable means to collect from the
seller and that allowed the seller “to use the mountain for his deceptive
practices.”  Id. at 598, 547 A.2d at 1335. 
We held that derivative liability for consumer fraud could not be imposed
“absent direct participation in the unfair or deceptive acts, direct aid to the
actor, or a principal/agent relationship.”  Id. at 598, 547 A.2d at 1335-36.  

¶ 14.         Particularly
relevant to this case is this Court’s discussion in Stedman of “direct
aid to the actor” in light of the decision in Goodman v. Federal Trade
Commission, 244 F.2d 574 (9th Cir. 1957).  Goodman generalized
that “one who ‘places in the hands of another a means of consummating a fraud
or competing unfairly in violation of the Federal Trade Commission Act is
himself guilty of a violation of the Act.’ ”  Id.
at 591 (citation omitted).  We noted that this principle applied in cases
involving principal/agency relationships and the doctrine of apparent
authority.  Thus, it did not provide liability for the ski-area owner, who
was not in a principal/agent relationship with the time-share seller and was
unknown to the purchasers.  Stedman, 149 Vt. at 598, 547 A.2d at 1336.  Similarly, we found that other
derivative-liability cases did not help the State because they all “involve a
degree of direct involvement not present here.”  Id. at 598-99, 547 A.2d at 1336.

¶
15.        
Stedman remains the last word on liability limitations in suits
by the Attorney General pursuant to 9 V.S.A. § 2458(a).  Further
developments on defining the actors subject to liability occur in the context
of § 2461(b), the private remedy section.  In Carter v. Gugliuzzi, 168 Vt. 48, 49, 716 A.2d 17, 19 (1998), we
held that the purchaser of a home could bring a CFA action against the real
estate broker for the seller for damages caused by misrepresentations made
during the selling process.  Citing the remedial purpose of the statute
and our policy of construing the statute liberally, we held that the term
“seller” in the private remedy section of the CFA includes real estate brokers
who sell the property as agents for the owner.  Id. at 53, 716 A.2d at 22.  In Elkins v. Microsoft Corp.,
174 Vt. 328, 817 A.2d 9 (2002), we again examined the meaning of the private
remedy section in the context of an antitrust claim against a software
manufacturer that sold a computer operating system to a computer manufacturer,
which bundled it with the computer hardware for sale to consumers.  Again
citing the broad remedial purpose of the CFA, we held that the consumer could
sue the software producer, despite the absence of privity,
as an “other violator” as provided in § 2461(b).  Id.
at 331, 341, 817 A.2d at 13, 20.

¶
16.        
The most complete explanation of this line of cases is in Sawyer v.
Robson, 2006 VT 136, 181 Vt. 216, 915 A.2d 1298, where a tenant sued a
landlord for violations of the CFA.  We held that the tenant could sue the
landlord as an “other violator” where “there was evidence landlords had engaged
in unfair and deceptive commercial practices.”  Id.
¶ 13.  We stated our rationale broadly: “The plain meaning of
‘other violator’ is anyone engaged in an unfair or deceptive commercial
practice in violation of the CFA’s prohibition on such activity.”  Id. ¶ 12.  We explained that “our focus in
determining applicability of the CFA is the nature of the alleged violator’s
activities, not whether the violator falls into a defined statutory
category.”  Id.

¶
17.        
Plaintiff interprets the line of § 2461(b) cases as authorizing a
type of private attorney general that can pursue CFA violations irrespective of
whether that consumer is harmed by them.  She argues that she can pursue a
CFA violation against any “violator,” including VAR, irrespective of whether
VAR’s actions actually harmed her.

¶
18.        
The main difficulty with plaintiff’s argument is that it gives the
private attorney general—her—more power than the public official Attorney
General.  Plaintiff’s argument also ignores the requirement that the
consumer must sustain damages or injury as a result of practices prohibited by
§ 2453.

¶
19.        
It is the first difficulty, however, that
primarily drives our resolution of the question before us.  There is no
indication that the Legislature intended that a private action be available
where the Attorney General cannot pursue a public action.  The private
right of action was intended to supplement the public right of action, not to
replace it.  For this reason, we conclude that the Stedman holding
applies both to public CFA suits and to private CFA suits like the one before
us.  We note that the United States District Court has applied Stedman
in this way.  See Repucci v. Lake
Champagne Campground, Inc., 251 F. Supp. 2d 1235, 1241 (D. Vt. 2002); Vt.
Mobile Home Owners’ Ass’n v. Lapierre,
94 F. Supp. 2d 519, 526 (D. Vt. 2000).  Thus, VAR cannot be found liable
“absent direct participation in the unfair or deceptive acts, direct aid to the
actor, or a principal/agent relationship.”  Stedman, 149 Vt. at
598, 547 A.2d at 1335-36.  The application of
this test in private CFA cases is appropriate because it looks to “the nature
of the alleged violator’s activities, not whether the violator falls into a
defined statutory category.”  Sawyer, 2006 VT
136, ¶ 12.

¶ 20.         VAR
had no direct involvement in the drafting of the contract used here and did not
act as a principal with respect to plaintiff’s broker.  Thus, it may only
be held liable if it provided “direct aid” to the broker.  In Stedman
we defined “direct aid to the actor” in a way that required some direct
involvement in the transaction at issue.

¶ 21.         In
fact, VAR’s involvement here was much less direct than that of the ski area
owner in Stedman.  In that case, the owner participated in a unique
hidden economic relationship with the time-share seller that allowed the seller
to defraud purchasers with no recourse.  Here, a broker obtained a form
from VAR that she could have obtained from many sources—for example, a lawyer,
a form book, or a public internet source.  The broker, not VAR, selected
the language to propose in the contract for sale, and the consumer agreed to
that language.  Assuming that the language is deceptive and that plaintiff
can show damages or injury, she has a remedy against her broker under the
CFA.  She also may contest the validity of the provision against any
broker who relies upon the allegedly-invalid terms.

¶ 22.         Plaintiff
points us to one decision that she argues supports her view that VAR should be
liable under the CFA, FTC v. Neovi, Inc., 604
F.3d 1150 (9th Cir. 2010). We find Neovi
distinguishable and unhelpful.  In that case, the defendant was a firm
that offered check-writing services for consumers through a website.  The
firm’s information-gathering system lacked basic security, so that unauthorized
persons could write checks on customer accounts.  Over fifty percent of
the amount of the checks written in the six years the company operated was
fraudulent.  Acting on thousands of complaints, the FTC successfully sued
to shut the company down.  Plaintiff argues that Neovi
is like this case because Neovi “permitted consumers
to be victimized, even if it was not itself part of a dishonest
transaction.”  Of course, in Neovi, the
consumers involved were the company’s customers, so the company was directly
involved in the fraudulent transactions.  As the Ninth Circuit said, the
defendant “controlled a system that facilitated fraud and . . . the
company was on notice as to the high fraud rate.”  Allowing Neovi to escape liability on the grounds that its users,
and not Neovi, created the fraudulent checks “would
immunize a website operator that turned a blind eye to fraudulent business made
possible only through the operator’s software.”  Id.
at 1155.  Here, there is no direct relationship between plaintiff
and VAR.  Nor is there any claim of widespread negative impact on
consumers from the VAR forms.  Neither the rationale nor the result in Neovi is helpful in analyzing VAR’s conduct here.

¶ 23.         We
can find no case law holding the operator of a web site liable because that
site contains forms with contractual provisions that, if used by third parties
at their election, may cause violations of the CFA.  Plaintiff points us
to no such precedent.  We note, however, that cases interpreting other
states’ statutes similar to the CFA are generally consistent with Stedman,
in that other jurisdictions usually require a person or entity that is liable
for a violation to have direct involvement in the fraudulent conduct that
creates the violation.  

¶ 24.         Two
decisions from Maryland appellate courts illustrate this principle.  In MRA
Property Management v. Armstrong, 43 A.3d 397 (Md. 2012), the plaintiffs
purchased condominium units from prior owners and, in the course of the sales,
received information from the condominium owners’ association and the property
management company on the annual maintenance costs.  The cost information
turned out to be understated because all of the units faced undisclosed major
repair expenses due to water damage caused by improper construction. 
After the purchases, the new owners were required to pay a large special
assessment for repairs.  There was, of course, no contractual relationship
between the purchasers and either the owners’ association or the property management
company.  Nevertheless, the purchasers sued the association and the
management company under Maryland’s consumer protection act.

¶ 25.         In
analyzing whether the defendants could be held liable, the Maryland Court of
Appeals drew on an earlier decision, stating “ ‘[i]t is quite possible that a deceptive trade practice
committed by someone who is not the seller would so infect the sale or offer
for sale to a consumer that the law would deem the practice to have been
committed ‘in’ the sale or offer for sale.’ ”  Id.
at 397 (quoting Morris v. Osmose Wood Preserving,
667 A.2d 624, 635 (Md. 2005)).  The court stated that it “is not dispositive” that a defendant is not “a direct seller.” 
MRA Prop. Mgmt., 43 A.3d at 412-13.  The
court held that the association and the management company could be held liable
under Maryland’s consumer protection act because “the operating budgets
provided by MRA and the Association could have sufficiently implicated them in
the entire transaction so as to impose liability under the Consumer Protection
Act, given that every plaintiff averred . . . that he or she would
not have purchased a unit if the budget provided by MRA and the Association had
disclosed the expenses necessary to correct the problems with the condominium
buildings.”  Id. at 413.

¶ 26.         In
reaching its conclusion, the court distinguished the decision of Maryland’s
Special Court of Appeals in Hogan v. Maryland State Dental Association,
843 A.2d 902 (Md. Ct. Spec. App. 2004), in which dental patients who had received
fillings containing mercury from their dentists sued the state dental
association, and its national counterpart, under Maryland’s consumer protection
act for withholding and suppressing information about the toxicity of mercury
fillings.  The Hogan court held that the dental associations were
not merchants who could be sued under Maryland’s consumer protection act
because plaintiffs did not allege that they “manufactured, sold, distributed,
implanted, or otherwise participated in the sale of dental fillings in a manner
that would support liability under the Act.”  Id.
at 906.  The court did not find sufficient a general claim that the
associations “took ‘an active role in controlling’ how member dentists
practiced their profession.”  Id.

¶ 27.         Consistent
with the Stedman rationale, this case is like Hogan and unlike MRA
primarily because VAR had no direct involvement in the consumer transaction
that allegedly violated the CFA.  In various contexts under comparable
statutory schemes, other courts have similarly required some direct involvement
for derivative liability to attach under a consumer protection act.  See,
e.g., Jurgens v. Abraham, 616 F. Supp.
1381, 1386-87 (D. Mass. 1985) (holding that a real estate developer who
contracted with a company to find a lender stated claims under state consumer
fraud act against two lawyers, where an officer of the company absconded with
plaintiff’s earnest money that was to be put in escrow, because one lawyer
“made false and misleading representations to plaintiff to induce him to enter
into an agreement designed to defraud him of a substantial sum of money” and
the second lawyer “directly aided [the officer] in absconding with the earnest
money”); State v. Cottman Transmissions Sys., Inc.,
587 A.2d 1190, 1202 (Md. Ct. Spec. App. 1991) (holding that franchisor of
transmission repair shops could be held liable to customers of franchisees
under state consumer protection act where franchisor required franchisees to
provide unnecessary repairs, but not for instances where franchisees charged
for fictitious repairs without direction from franchisor); Ramapo Brae
Condo. Ass’n v. Bergen Cty. Hous. Auth., 746
A.2d 519, 530 (N.J. Super. Ct. App. Div. 2000) (holding
architect of condominium development not liable to purchaser under state
consumer protection act for improper construction where architect was not
involved as a principal or as a retained principal in a real estate marketing
venture but whose services were held out as part of what was sold); Hill v. StubHub, Inc., 727 S.E.2d 550, 561 (N.C. Ct. App. 2012)
(holding that operator of an internet marketplace for purchase and sales of
sports and event tickets is protected by § 230 of the Communications
Decency Act, 47 U.S.C. § 230, from consumer fraud liability when third
parties sell tickets at prices above those allowed by North Carolina law
because the website does not “control the content posted by those third parties
or take other actions which essentially ensure the creation of unlawful
material”); Schmidt v. Cornerstone Invs., Inc.,
795 P.2d 1143, 1151 (Wash. 1990) (holding that private investors in a
commercial real estate purchase, the price of which was based on a fraudulent
appraisal, could not hold the lawyer for the purchaser liable for consumer
fraud because he had no contact with the appraiser and was not involved in
soliciting plaintiff’s investment).

¶ 28.         In
sum, the trial court correctly held that “VAR’s sole connection to this
case—drafting the template clauses that [plaintiff] and her buyer’s broker
eventually used—cannot support a consumer fraud claim.”  For that reason,
the court properly granted summary judgment to VAR.

Affirmed.

 


  
 
 
  
 
 
 FOR THE COURT:
 
 
  
 
 
  
 
 
  
  
  
  
 
 
  
 
 
  
 
 
 Associate
 Justice
 
  











*  The website
states: “TrueForms helps simplify the forms and
contracts process and allows members to conduct transactions efficiently,
protecting the interest of all parties.”  The website also calls the forms
“Approved.”  While plaintiff emphasizes these representations, there is no
allegation that they were seen by plaintiff.  Nor is it clear that the
website page is available to the public, rather than just to members.