Vermont Superior Court
Filed 11/29/23
Lamoille Unit

VERMONT SUPERIOR COURT
Lamoille Unit
154 Main Street
Hyde Park VT 05655
802-888-3887
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 21-CV-02521

| Krystal Whitney v. Auto Source Direct, LLC, et al |
| --- |

## FINDINGS, CONCLUSIONS, AND JUDGMENT

The present matter concerns the trade-in and purchase of a used car gone wrong. Plaintiff Krystal Whitney has brought twelve clams against Defendant Auto Source Direct, LLC alleging consumer fraud, common law fraud, breach of warranty, breach of state auto sale contract law, breach of federal regulations around used cars, and breach of the uniform commercial code. This matter came before the Court for a bench trial on May 31, 2023 and post-hearing briefing extended into June 2023. Based on the findings and conclusions that follow, the Court finds that Defendant Auto Source Direct violated the consumer fraud law and breached warranties, and as a result of these breaches, Defendant Whitney suffered an unintended increase in her debt load, lost a functioning car for one that did not work, and she is entitled to monetary damages and attorney's fees.

### Findings

In July of 2020, Krystal Whitney was living in Eden, Vermont and owned a 2018 Mazda CX5 hatchback. Whitney had purchased the car with financing and was still making monthly payments. Due to a downturn in her economic situation, Whitney needed to reduce her monthly payments and overall debt load. With that purpose, Whitney approached Auto Source Direct, LLC a small, used car dealer located in Colchester, Vermont.

Whitney had gone to Auto Source Direct because they had a 2013 Dodge Dart on the lot listed for $7,000. The price of this vehicle fit with Whitney budget. Following a test drive, Whitney found no issues with the vehicle, apart from a missing seatbelt clasp on the passenger's side (this was later found tucked into the crevasse of the seat, but once found, it would not latch). Whitney also credibly testified that she smelled a slight burning smell but was assured by Auto Source Direct's representatives that it was normal and that Dart engines run hot when not driven regularly. Following this test drive, Whitney explained her parameters to the Auto Source Direct's representatives and

salespeople. She wanted to trade in her Mazda, use those proceeds to pay off the outstanding debt on the Mazda, and apply any further proceeds from the trade-in against the price of the Dart. Whitney needed to finance the remainder of the purchase price, but she had calculated and expected that the less expensive car would bring down her monthly payments between $250 and $220. Auto Source Direct admits in its proposed findings that its representatives had this exact discussion with Whitney and that this was her stated purpose of taking the somewhat unusual step of trading in a newer, nicer automobile for an older one.

During this discussion where Whitney expressed her budgetary needs and purpose, Auto Source Direct's representatives made several representations to Whtiney that were later contradicted by the actual paperwork. First, Auto Source Direct offered Whitney a Vehicle Service Contract, a Maintenance Contract, and a GAP contract. Whitney testified that the representative told her that these additions were free and part of the package that Auto Source Direct offered as part of the sale. Whitney agreed to these additional contracts. Far from free, these contracts were value-added products that carried additional charges of $4,590 to the price of the car. Out of these policies, approximately 50% went to Auto Source Direct as a commission.

Second, Whitney had the understanding that the trade-in of her Mazda would satisfy the outstanding balance on that vehicle. In fact, the dealer trade-in left Whitney with a $2,510 "negative balance," and was eventually added to the financing with her new purchase. In these two steps, the price of Whitney's purchase doubled from $7,000 to $14,000. With other closing costs attached, the total sale price that Whitney financed ended up being $15,693.93.

Whitney testified that she was not aware of these facts at the time of her purchase. After waiting 24 hours, she went back to Auto Source Direct and agreed to purchase the Dart and trade-in her Mazda, but she re-emphasized the need to keep her monthly payments to $220. Whitney credibly testified that she was then taken back into the office at Auto Source Direct and given papers to sign. According to Whitney Auto Source Direct's finance person did not review the documents with her. He simply directed her where to sign. Auto Source Direct did not give Whitney a copy of the paperwork, and she left without an understanding of the costs or a breakdown of her expenses.

While Auto Source Direct disputes Whitney's versions of events, the Court does not find this denial credible for two reasons.

First, the nature of the deal was, as Auto Source Direct admits, unusual. Buyers do not usually trade in a nicer car for an older lesser one, but in this case, Whitney had stated a specific purpose. She wanted to reduce her monthly payments and overall debt-load. If these costs and payments were, in fact, adequately explained, it would have been obvious to everyone that this transaction was raising Whitney's monthly payment and increasing her debt load. Instead of making a deal that switched a more expensive but nicer car for a lesser but cheaper car, Whitney was getting a lesser but more expensive car. In effect, the paperwork shows that Whitney was not getting any benefit from the bargain but was taking on increased debt for a car that was in objectively lesser condition and quality to her prior car. This transaction makes no sense—unless Whitney was unaware of the added costs and negative balances that were effectively doubling her transaction.

Second, there is a fundamental disconnect in this case between what Auto Source Direct states it understood about the transaction, namely that Whitney was looking to lower her costs, and the valued-added pieces that Auto Source Direct sought to sell her. The Court does not find the offering or even the selling of such value-added pieces to be per se illegal or even uncommon for a retailer to offer, but in the context of this transaction, it created a disconnect between what Whitney wanted (lower payments) and what Auto Source Direct wanted (the benefit of the sale and the 50% commission from the value-added contracts). Whitney's contemporaneous statements to her family and others support this understanding. She walked away from the transaction with the belief that she had made a deal to lower her debt and monthly payments. Auto Source Direct, which proposed the additions, drafted the contracts, and oversaw the entire contracting process, was pushing—despite its knowledge of what Whitney wanted—for a different deal.

As a final note, the Court finds Whitney's testimony regarding the forms to be credible as to who filed out the forms. Whitney notes that one of the forms used to determine her eligibility for a specific loan rate names an "Uncle Charles Whtiney" as a veteran. The problem is that Whitney does not have an "Uncle Charles" or any uncle that served in the armed forces, and the form is not in her handwriting. The Court finds this to be further evidence that Auto Source Direct or one of its agents filled out the form, using incorrect information and did not review it with Whitney in any substantial way.

Based on these findings, the Court finds Whitney's testimony and version of the contract formation to be more credible and finds that Auto Source Direct failed to disclose that her trade-in created negative equity and that the value-added contracts were additional costs, which together would

double the amount of money that Whitney would have to finance. The Court finds that while Auto Source Direct did not affirmatively hide this information from Whitney, they did fail to disclose it to her in any meaningful way by not reviewing the documents with her but having her sign them in an automatic fashion, glossing over the details and components of the transaction. Thus, despite the fact that Whitney's signature appears on each document, the Court finds that no meaningful disclosure took place and that the add-on costs and additional expenses from the trade in were not discussed or disclosed.

Almost immediately after her purchase, Whitney began to have mechanical issues with the Dart. The car continued to run hot, and the clutch felt loose. The electric components for the mirrors and the door locks worked inconsistently, and the "hot smell" that Whitney noticed on the first test drive persisted. The clutch would stick and on at least one occasion Whitney and others noticed smoke emanating from the wheels near the rims where the brake calipers were located. Later the reverse cable snapped, and Whitney could not put the Dart into reverse. Whitney brought the Dart into Auto Source Direct for repairs with each problem. While Auto Source Direct was able to repair various issues, such as the reverse cable, it was not able to pinpoint the source of other issues with the car. Auto Source Direct took the car to Goss Dodge, a local Dodge dealer, who was also unable to replicate the issues Whtiney claimed with the car. Whitney brought the car into Auto Source Direct several times. Each time, Auto Source Direct sought to perform repairs or diagnose the problem, and each time, the repairs did not appear to resolve the underlying problem.

Whitney approached Auto Source Direct about trading in the Dart for a different car, including a Hyundai that Auto Source Direct provided to her when the Dart was in the shop. This trade proved unfeasible in light of the substantial debt that Whitney had incurred in the purchase of the Dart. In other words, shortly after purchasing the Dart, Auto Source Direct admitted that the balance due exceeded the value of the Dart.

In March of 2021, Whitney, through counsel, notified Auto Source Direct that she was no longer driving the Dart and had left it parked on a public street in Morrisville, Vermont. Whitney further notified Auto Source Direct that the car had been towed. Whitney demanded that Auto Source Direct recover the car to prevent its loss pending the outcome of the litigation. Neither Auto Source Direct, nor Whitney recovered the Dart, and it was later sold by the towing company to a third-party based on salvage. As of the date of trial neither party was in possession of the Dart, and neither party

can state its current condition or offer anything more than testimony based on prior testing or observations made prior to March of 2021.

The Court finds that the evidence regarding the condition of the car is inconclusive. While there was some evidence suggesting that the Dart had mechanical issues, there was no credible evidence that the car had not legitimately passed its prior inspection or that the car was not in a merchantable condition at the time of sale. Furthermore, Auto Source Direct appears to have taken steps to perform repairs for any mechanical issues occurring in the wake of the sale. This includes repairing the snapped reverse cable as well as replacing brake pads, rotors, and calipers. The Dart at the time of sale had 73,827 miles. By late September 2020, it had 78,444, which means that Whitney put on over 4,500 miles in the two months between her purchase and late September repairs. This amount of mileage belies the idea that the Dart was undriveable or that it was not a merchantable vehicle.

## Legal Conclusions

### Breach of Warranty

Based on the findings above, the Court finds no basis for Plaintiff's claims for breach of implied warranty under 15 U.S.C. § 2301 or 9A V.S.A. § 2-314. The evidence is that Whitney drove the car extensively after her purchase. While there is some evidence of mechanical issues, the evidence does not support Whitney's burden of establishing that the defects were such that Auto Source Direct breached its warranty. The Corut finds that the Dodge Dart, which had over 73,000 miles at the time of purchase and was already seven years old evinced defects that were consistent with an older car and the mechanical breakdown that can occur in such vehicles. While Whitney offered Michael Maxfield as an expert witness, Maxfield's examination of the car was more observation, than actual examination. Regardless of how good a mechanic Maxfield may be, and the Court has no reason to classify him as anything else, his examination was more informal and problem solving. While he may believe that the vehicle should not have passed inspection, he does not give the type of learned opinion that might give the Court some reason to understand why. His testimony also does not explain how Auto Source Direct should have been on notice of these defects.

There is no evidence that these defects were known to Auto Source Direct or its agents or that they were readily discoverable. For example, the running hot issue, the smoke around the wheels, and the clutch issues were all difficult to replicate in either Auto Source Direct's shop or in Goss Dodge's

shop. As such, the evidence of defects is inconclusive, and the Court cannot conclude based on the findings that the defects that subsequently arose were violations of either state or federal warranty law. These conclusions also apply to Plaintiff's third claim concerning breach of the consumer protection act for misrepresentation of mechanical fitness.

*Consumer Fraud (Misrepresentation of Terms)*

Based on the findings above, the Court concludes that Auto Source Direct, through its agents, misled Whitney about the price that she would be paying for the Dodge Dart. Instead of the $7,000 list price, the actual price was double and included additional contracts that were not fully disclosed, described, or explained. The Consumer Fraud Act prohibits "unfair or deceptive acts or practices in commerce." 9 V.S.A. § 2453(a). To establish a "deceptive act or practice" under the Act requires three elements: "(1) there must be a representation, omission, or practice likely to mislead consumers; (2) the consumer must be interpreting the message reasonably under the circumstances; and (3) the misleading effects must be material, that is, likely to affect the consumer's conduct or decision regarding the product." *Carter v. Gugliuzzi*, 168 Vt. 48, 56 (1990) (citing *Peabody v. P.J.'s Auto Village, Inc.*, 153 Vt. 55, 57 (1989)).

As the Vermont Supreme Court notes, deception (element 1) is an objective test, materiality (element 3) may be an objective or subjective test. *Carter*, 168 Vt at 56. In this case, the evidence indicates that Auto Source Direct's agents made representations that misled and hid the true costs of the add-on contracts. Auto Source Direct also never explained the terms of the contract to Whitney, which led her to understand that she was entering a $7,000 contract when in fact she was entering a $15,000. This misleading information was particularly material as Whitney had stated the entire reason for the transaction was to lower her debt load and reduce her payments. The fact that she was not and was, in fact, trading down for additional debt went against her intent and purpose for entering into the contract.

While Whitney did sign various contracts and disclosures that spelled out the various terms, Whitney credibly testified that Auto Source Direct never reviewed these forms and numbers with her, and she simply signed where directed as the forms had been pre-filed by Auto Sources Direct, and she was simply directed to the signature blocks. The Court concludes that these omissions and failure to explain or properly disclose are an omission or practice that are likely to mislead consumers. The Court also concludes that Whitney acted in a reasonable manner as she trusted Auto Source Direct to understand the nature of the bargain that she was seeking and to be upfront about any additional costs.

Finally, these additional costs were material to Whitney's entire purpose for entering into the transaction. For these reasons, the Court concludes that Auto Source Direct used false representations and practices, which are prohibited by 9 V.S.A. § 2453, and as a result, Auto Source Direct is liable under 9 V.S.A. § 2461(b) for the costs sustained by Whitney in an agreement that ran contrary to her stated and express intent.

Auto Source Direct in its answer and brief states that any confusion or misstates in the contracting process were inadvertent and did not reflect an intent to deceive or mislead. This defense, while valid against a claim of common law fraud, does not require proof of intent. "[T]he [Consumer Protection] Act 'does not require a showing of intent to mislead, but only an intent to publish the statement challenged.'" *Carter*, 168 Vt. at 56 (quoting *Winton v. Johnson & Dix Fuel Corp.*, 147 Vt. 236, 244 (1986)). This is because the intent of the seller does not control the consumer fraud analysis. If the seller does not intend to create a misleading or confusing situation, it may still be consumer fraud if a consumer reasonably perceives the situation in a misleading manner.

In this respect, the Court has not made any findings of malice or ill-purpose, and it draws no negative conclusions about Auto Source Direct's intent in this matter. Auto Source Direct's owners testified that they ran through the paperwork with Whitney, and there is no reason to dispute that Autor Source Direct went through some process, but the overwhelming evidence is that this review was cursory and focused only on closing the deal and did not accurate summarize or explain the added costs, the corrected trade-in numbers, or the scope of the transaction to which Whitney was entering. As such Auto Source Direct's intent not to mislead is irrelevant. It did mislead and deceive in its effect on Whitney. For these reasons, this defense does alter the Court's conclusion.

## Common Law Fraud and Punitive Damages

The lack of malice is, however, fatal to Whitney's claims for both common law fraud and punitive damages. The Court finds no intent to mislead and no malice. As such, the facts do not give rise to a common law fraud claim or eligibility for punitive damages. *Union Bank v. Jones*, 138 Vt. 115, 121 (1980) (common law fraud in the inducement requires a showing of intent to mislead); *Bisson v. Ward*, 160 Vt. 343, 351–52 (1993) (requiring a finding of malice, ill-will, or wanton disregard before punitive damages can be awarded). As such, the Court concludes that Whitney has not established either claim, and they are denied.

## Remaining Consumer Fraud Claims

Whitney's claims for breach of 16 C.F.R. § 455; 15 USC §1679b; misrepresentation of income information; falsification of eligibility for membership in SCU; and breaches of the Motor Vehicle Retail Installment Sales Financing Act and Motor Vehicle Retail Installment Sales Financing Act are effectively re-statements of the underlying consumer fraud claim analyzed above. These claims address specific documents and review procedures that Auto Source Direct as an automobile seller was obligated to disclose or to insure were correctly filled-out. Consistent with the analysis above, the Court finds that Auto Source Direct did not review the documents with Whtiney and did not provide her with a copy of the key disclosures for her to review. The Court also finds that Auto Source Direct provided inaccurate and untrue information about Whitney's finances and eligibility for SCU (which required proof of a family member with military service).

These breaches, however, constitute portions of the same transaction as the underlying violations of 9 V.S.A. § 2461 analyzed above. They represent a breakdown in the process of ensuring that Whitney fully understood the nature of the transaction into which she was entering and the nature of the obligations to which she signed. Therefore, the Court concludes that Plaintiff has established these claims based on the findings above.

## 9A V.S.A. § 2-608

Whitney seeks a determination that she sought to revoke her acceptance of the Dodge Dart in a timely manner. The problem with applying Section 2-608 to the present case is that the evidence is inconclusive as to any substantial non-conformity or failure of the object to function within the parameters of a 7-year-old-70,000-mile car. While Whitney stated that she had lost faith in the Dart as a safe vehicle, the evidence also indicates that Whitney drove the car over 4,500 miles. There was no credible testimony about the condition of the car apart from one witness' observation and belief about the car's condition and eligibility for inspection, which is contradicted by the fact that the car was inspected. It is also not clear from the evidence if the defects Whitney experienced in the Dart could be repaired as Auto Sources Direct and at least one other mechanic could not re-create the issues. Cf. *Wilk Paving, Inc. v. Southworth-Milton, Inc.*, 162 Vt. 552, 555 (1994) (noting that buyer gave seller multiple opportunities over a nine-month period to fix readily identifiable mechanical issue with a roller). Unlike the buyer in *Wilk Paving*, Whitney gave Defendant approximately five months (testimony indicates that she stopped bringing the Dart to Auto Source Direct in December 2020). The work that Auto Source Direct appears to be a mixed bag. Auto Source Direct was able to repair some of the defects, such as the reverse cable and a loose shifter knob. Othe defects proved difficult to

identify, but Auto Source Direct did take the car to a dodge dealer and had various diagnostic tests run on the vehicle. These tests did not identify a problem, but Whitney and her witnesses claimed one persisted. The Court is not persuaded that this process reached an end point. It was simply inconclusive and grew adversarial as frustrations mounted.

Finally, it is undisputed that Whitney was aware of some of the defects at the time of purchase, the electric locks and mirrors gave her trouble, the seat belt buckle was missing, and the car was running hot. Under Section 2-608, a buyer cannot seek recission for non-conformity, which the buyer knows or should have known were non-conforming at the time of purchase. *Rutland Music Service, Inc. v. Ford Motor Co.*, 138 Vt. 562, 564 (1980). In such cases, only if the non-conformity "substantially impairs" the value of the good can the buyer seek recission. Id. at 564–65. In this case, there was no evidence as to the value of the Dart at the time Whitney sought to rescind her purchase. Because the car was towed and sold to a third-party, there is no evidence as to its condition or value.

Based on the foregoing, the Court denies Whitney's UCC claim.

## *Breach of the Covenant of Good Faith and Fair Dealing*

Whitney casts the various omissions by Auto Source Direct as a violation of the implied covenant of good faith and fair dealing. This covenant is an implied term of every contract. *Carmichael v. Adirondack Bottled Gas Corp of Vermont*, 161 Vt. 200, 208 (1993). This covenant represents a promise by each party "not to do anything to undermine or destroy the other's rights to receive the benefits of the agreement." Id. As noted above, the Court does not find Auto Source Direct's efforts to repair the Dart or its representations regarding the mechanical issues to have been established as either fraud or violations of Article 2 of the UCC. The Court similarly concludes that Auto Source Direct's actions regarding the mechanical issues with the Dart does not violate the Covenant of Good Faith and Fair Dealing.

This leaves the question of whether the contract formation issues, particularly the inclusion of additional contracts and costs without disclosure constitute bad faith violations of the covenant. As *Carmichael* instructs, the analysis of this covenant is a factual determination. *Carmichael*, 161 Vt. at 208–09. In this case, the facts show that the contract formation process went directly against the intend and purpose of Whitney's stated intent and purpose, to trade-in her newer car for a lower debt load. The inclusion of additional services and contracts and the failure to disclose these to Whitney constituted actions the subverted the benefits that Whitney intended to receive in the contract. As

such, the Court concludes that Auto Source Directions' actions in adding additional contracts that effectively doubled the price of the purchase and failing to explain and disclose these additions to Whitney constituted a violation of the covenant of good faith and fair dealing in that these additions locked Whitney into a larger debt load that made her ability to address the subsequent mechanical issues all but impossible and left her with more debt and a lower quality vehicle at the end of the transaction.

As noted above, this conclusion does not include a finding of malice, which is necessary for any award of punitive damages. *Monahan v. GMAC Mortg. Corp.*, 2005 VT 110, ¶¶ 53–56. Without such evidence, the Court's conclusion that Auto Source Direct violated the covenant of good faith and fair dealing does not include the imposition of punitive damages.

*Damages*

Based on the findings and conclusions above, the Court concludes that Auto Source Direct violated 9 V.S.A. § 2461 by misleading Whitney about the nature of her transaction and providing incorrect information to her and others on her behalf in the process of selling her the Dodge Dart. The Court also finds that these actions constitute a violation of the covenant of good faith and fair dealing. As such, Whitney is entitled compensatory damages under these claims. *Harsch Properties, Inc. v. Nicholas*, 2007 VT 70, ¶¶ 21–24 (discussing damages for a violation of the covenant of good faith and fair dealing); *Vastano v. Killington Valley Real Estate*, 2010 VT 12, ¶¶ 6, 7 (discussing the limits for damages under consumer fraud law). In addition to damages, the consumer fraud provision carries a provision for the prevailing plaintiff to also collect their attorney's fees. 9 V.S.A. § 2461(b); see also *Vastano*, 2010 VT 12, ¶¶ 9, 10.

The evidence shows that Whitney purchased the Dart for **$6,923.** The proceeds of this sale went to Auto Source Direct, and she is entitled to recover these amounts as the evidence shows that Whitney would not have agreed to this transaction but for the misstatements and omissions of Auto Source Direct. As the Dart was a total loss to her, the Court concludes that this purchase price is a reasonable compensatory damage, and it would be inequitable for Auto Source Direct to retain this price. Auto Source Direct kept 50% of the proceeds of the VSC, maintenance, and GAP contracts as commissions and 50% went to third parties who provided the policies. The Court calculates these commissions to be **$2,295**. Whitney is entitled to the return of these commissions that Auto Source Direct has retained. The Court also awards the amount collected by Auto Source Direct as a document fee in the amount of **$499**.

Whitney is not entitled to recover the $2,510 that arose from the difference between the value of the Mazda trade in and what she owed on her financing. However, Whitney does seek compensation for the loss of income for the time she has spent dealing with Auto Source Direct. While the Court will not make such an award for lost time resulting from repairs, the Court will award the **$2,510** as a reasonable estimate for lost wages and time resulting from Whitney's efforts to resolve the contractual issues, obtain copies of the contract documents, and attempt to undo the additional contracts, which the Court has ruled were valid consumer fraud and breach of the covenant of good faith and fair dealing claims. Added together with the prior numbers, the Court calculates the total damages to be **$12,227**. The Court awards this amount to Plaintiff Whitney.

The Court denies Whitney's request for punitive or exemplary damages as the evidence of malice or ill-intent is absent. The Court also declines to impose pre-judgment interest as the amounts awarded were not clear or evident until the Court ruled on Whitney's claims. As such, they were not liquidated, and the Court finds no basis to award this amount.

Finally, the Court awards Whitney her attorney's fees in this matter consistent with 9 V.S.A. § 2461(b) as she is the prevailing party on her consumer fraud claims. Whitney may submit a motion for an award of costs and reasonable attorney fees, together with itemized records supporting the request, and should do so within 15 days of the file-stamped date of this motion. Auto Source Direct may submit any opposition to the amount of fees within 10 days thereafter. The court will rule on the motion under the applicable standards, e.g., *Trevor v. Icon Legacy Custom Modular Homes, LLC*, 2019 VT 54, ¶ 86, 210 Vt. 614; *L'Esperance v. Benware*, 2003 VT 43, ¶ 22, 175 Vt. 292; *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The Court shall conduct a hearing if it deems it necessary to determine the reasonable amount of attorney's fees.

## **ORDER**

Plaintiff Krystal Whitney shall have judgment against Defendant Auto Source Direct, LLC in the amount of **$12,227** based on Plaintiff's claims of consumer fraud and breach of the covenant of good faith and fair dealing. The Court also awards reasonable attorney's fees to Plaintiff Whitney, which Plaintiff and Defendant shall establish through subsequent filings consistent with this decision.

**So Ordered.**

Electronically signed on 11/29/2023 3:50 AM pursuant to V.R.E.F. 9(d)

ce Direct, LLC, et al

_____
Daniel Richardson
Superior Court Judge